Robert C. VOSS, Trustee, Plaintiff,

CITY OF MADISON, a municipal corporation, Plaintiff-Appellant,

v.

CITY OF MIDDLETON, a municipal corporation, Defendant-Respondent-Petitioner.

Supreme Court

*No. 89-1519. Argued March 26, 1991.—Decided June 19, 1991.*

(Also reported in 470 N.W.2d 625.)

For the defendant-respondent-petitioner there were briefs by *Lawrence E. Bechler* and *Jenswold, Studt, Hanson, Clark & Kaufmann* and oral argument by *Mr. Bechler.*

For the plaintiff-appellant the cause was argued by *James M. Voss,* assistant city attorney, with whom on the brief was *Henry A. Gempeler,* city attorney.

STEINMETZ, J. The dispositive issue in this case is whether the city of Madison (Madison) or Robert C. Voss (Voss) is an "abutting" owner of land in relation to a portion of a street proposed to be discontinued by the city of Middleton (Middleton) within the meaning of

sec. 66.296(2)(c), Stats.[1] If and only if so, then one or the other can veto the vacation.[2]

The circuit court for Dane county, Judge James C. Boll, determined that the dispositive issue was whether the plaintiffs were "abutting" landowners in relation to a street under sec. 66.296(2)(c), Stats. The trial court considered "abutting" to be unclear and ambiguous in this context. After analyzing the statute, the court determined that "abutting" requires having present access to a street or a reasonable expectation thereof. Finding that Madison and Voss had neither, the trial court granted summary judgment in favor of Middleton. Madison appealed.

The court of appeals[3] agreed that the dispositive issue was whether the plaintiffs were owners of property "abutting" a street within the meaning of sec. 66.296(2)(c), Stats. However, the court of appeals determined that the statute was clear and unambiguous and, relying upon *Royal Transit, Inc. v. West Milwaukee,* 266 Wis. 271, 63 N.W.2d 62 (1954), proceeded to conclude

---

[1]Section 66.296(2)(c), Stats., provides as follows:

> No discontinuance shall be ordered if a written objection to the proposed discontinuance is filed with the city or village clerk by any of the owners abutting on the portion sought to be discontinued or by the owners of more than one-third of the frontage of the lots and land abutting on that portion of the remainder thereof which lies within 2,650 feet from the ends of the portion proposed to be discontinued; or which lies within so much of said 2,650 feet as shall be within the corporate limits of the city or village. The beginning and ending of an alley shall be deemed to be within the block in which it is located.

[2]For purposes of this case, the words "discontinue" and "vacate" and their respective variants will be used interchangeably.

[3]*Voss v. City of Middleton,* 156 Wis. 2d 265, 456 N.W.2d 632 (Ct. App. 1990).

that Madison and Voss, either or both of them, were "abutting" owners insofar as their land touched Middleton Street. Reversing the trial court, the court of appeals held that as "abutting" owners the plaintiffs had a right to veto Middleton's vacation of the end of Middleton Street in Middleton. Middleton, pursuant to sec. 808.10, appealed to this court.

This case arises out of claims by Madison and Voss, who, as owners of property located entirely in Madison, assert that according to sec. 66.296(2)(c), Stats., they can veto Middleton's vacation of a portion of Middleton Street, which lies in a residential area entirely within Middleton. The portion of Middleton Street in issue comes to a dead-end at the east-west line defining the border between Madison and Middleton. Some yards west of this area is the east edge of Stricker's Pond, part of a Middleton nature conservancy considered by some to constitute a very fragile ecosystem. Middleton erected and continuously maintained a barricade at the dead-end since 1970, when it constructed the portion of Middleton Street in question. The land on the Madison side of the border was unimproved and dedicated to agricultural uses until recent years.

Prior to 1983, Voss, as trustee for the owners of much of the land within the plat, submitted a number of preliminary plats of the land for Madison's approval pursuant to sec. 236.11(1)(a), Stats.[4] These plats showed

---

[4]Section 236.11(1)(a), Stats., provides as follows:

Before submitting a final plat for approval, the subdivider may submit, or the approving authority may require that the subdivider submit, a preliminary plat. It shall be clearly marked 'preliminary plat' and shall be in sufficient detail to determine whether the final plat will meet layout requirements. Within 90 days the approving authority, or its agent authorized to approve preliminary plats, shall take action to approve, approve conditionally, or reject the preliminary plat and shall state in writing any conditions of approval or

various street layouts connecting Gammon Road in Madison to the end of Middleton Street at the border. Although the municipalities had not formally agreed to a system of information sharing as to proposed developments near their common border, this apparently took place in a context in which an informal system was established between the parties and used by them.

In 1983, Voss submitted another preliminary plat for the same lands showing Middleton Street terminating in a cul-de-sac, only the "bulb" of which was located south of the border. This layout was furnished to Middleton by Madison and was acceptable to Middleton. However, Madison never formally approved the plat, and the area remained undeveloped.

In 1986, Voss submitted another preliminary plat for the same lands showing a street design directly connecting Gammon Road to the end of Middleton Street at the border. The land immediately to the east of the proposed connecting street, extending from the border southward into the proposed subdivision, was owned by Voss. Madison owned the land immediately to the west of the proposed street. The revised plat and street layout were never transmitted to Middleton officials. The plat was conditionally approved by Madison in July 1986. After Middleton officials learned of the changes to the plat and its preliminary approval, they attempted to participate in the final approval proceedings, but these attempts were rebuffed by Madison. For his part, Voss indicated that he was unwilling to modify the plat layout, and that he expected final plat approval in the form submitted. He also threatened to take legal action

reasons for rejection, unless the time is extended by agreement with the subdivider. Failure of the approving authority or its agent to act within the 90 days, or extension thereof, constitutes an approval of the preliminary plat.

against Madison if the final plat was not approved as submitted.

Middleton Street in Middleton has long been a local street with very low traffic volumes. The Dane County Regional Planning Commission estimated the traffic on Middleton Street would increase up to twenty-fold from its previous level if connected to Madison's street. Middleton's staff estimated that its taxpayers would have to pay an estimated $50,000 to improve Middleton Street to handle the traffic that Madison traffic would generate if the streets were joined.

On March 31, 1987, Voss's plat still had not been finalized. On that same date, pursuant to sec. 66.296(2)(a), Stats., the Middleton common council introduced a resolution to vacate the southernmost ten feet of Middleton Street, replacing the dead-end at the border with a cul-de-sac entirely within Middleton. A date was set for a public hearing and final action on the resolution. Pursuant to the statute, notice of the hearing on the resolution was given to owners of all property touching the south portion of Middleton Street within Middleton. Informally, Madison, including its city attorney, and Voss were also furnished information on the proposal.

On April 6, 1987, Voss finalized his subdivision plat by recording it with the Dane County Register of Deeds. As perfected, the plat subdivided the lands within Madison and provided for a through street purporting to connect with Middleton Street at the border. At this time, no street of any kind was in existence in the subdivided area on the Madison side of the border.

Prior to the hearing on Middleton's proposal to vacate the southern tip of Middleton Street, Madison and Voss filed written objections to the proposal, purportedly pursuant to sec. 66.296(2)(c), Stats. The hear-

ing took place on May 19, 1987. Following the hearing, the Middleton common council adopted the resolution vacating the street, and Middleton removed ten feet of pavement extending north into Middleton from the border, leaving in place the barricade itself.

Madison and Voss then commenced a declaratory judgment action challenging the vacation. Madison moved for summary judgment. At that time, the platted lands were still unimproved and no street directly relevant to this case yet existed south of the border. The street Madison intended to link Gammon Road in Madison with Middleton Street in Middleton was constructed a month or so later and designated "Middleton Street" in Madison. Today, the subdivision is for all intents and purposes fully developed.

During the pendency of the motion, affidavits were filed in support of Middleton's position by a number of residents of the developing subdivision in Madison platted by Voss. These Madison residents indicated 100 percent opposition to their city's insistence on pursuing connection of "Middleton Street" in Madison with Middleton Street in Middleton. The same is essentially the case for those landowners in Middleton who are "abutting" on Middleton Street.

There is a standard methodology which a trial court follows when faced with a motion for summary judgment. *Green Spring Farms v. Kersten,* 136 Wis. 2d 304, 315, 401 N.W.2d 816 (1987), *citing Grams v. Boss,* 97 Wis. 2d 332, 338, 294 N.W.2d 473 (1980). The first step of that methodology requires the court to examine the pleadings to determine whether a claim for relief has been stated and a material issue of fact presented. *Id.,* 97 Wis. 2d at 338. If a claim for relief has been stated, the inquiry then shifts to the moving party's affidavits or

other proof to determine whether the moving party has made a *prima facie* case for summary judgment under sec. 802.08, Stats. *Id.* To make a *prima facie* case for summary judgment, a moving defendant must show a defense which would defeat the plaintiff. *Id.* If the moving party has made a *prima facie* case for summary judgment, the court must examine the affidavits and other proof of the opposing party to determine whether there exist disputed material facts or undisputed material facts from which reasonable alternative inferences may be drawn sufficient to entitle the opposing party to a trial. *Id.* Under sec. 802.08(2), summary judgment must be entered " 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' " *Kersten,* 136 Wis. 2d at 315.

When reviewing the grant of a summary judgment motion, this court is required to apply the standards set forth in sec. 802.08, Stats., just as the trial court was to apply those standards. *Id.* When testing the sufficiency of a complaint, the court takes all facts pleaded by the plaintiff and all inferences which can reasonably be derived from those facts as true. *Id.* at 317. "Pleadings are to be liberally construed, with a view toward substantial justice to the parties. Section 802.02(6)." *Id.* The complaint should be dismissed as legally insufficient only if it is quite clear that under no circumstances can the non-moving party prevail. *Id.*

Disposition of this case depends solely on the meaning of sec. 66.296(2)(c), Stats., and, in particular, its use of the word "abutting" to describe certain landowners in relation to a street under the facts and circumstances

748

presented. Specifically, the issue is whether either of the landowners here, Voss or Madison, is an "abutting" owner under the statute. If and only if so, either can veto Middleton's vacation of Middleton Street as a matter of law, insofar as no material facts are in dispute.

Because interpretation of a statute presents a question of law, review is de novo. *Town of Clearfield v. Cushman,* 150 Wis. 2d 10, 19, 440 N.W.2d 777 (1989). The sole purpose of this review is to ascertain the intent of the legislature. *Marshall-Wis. v. Juneau Square Corp.,* 139 Wis. 2d 112, 133, 406 N.W.2d 764 (1987). In ascertaining that intent, the first resort is to the language of the statute itself. *Id.* If it clearly and unambiguously sets forth the legislative intent, it is our duty to apply that intent to the facts and circumstances of the case; we are prohibited from looking beyond the language of the statute to ascertain its meaning. *Id.* If and only if the language of the statute does not clearly or unambiguously set forth the legislative intent, will we resort to judicial construction of the statute so as to ascertain and carry out the legislative intent. *Green Bay Redevelopment Authority v. Bee Frank,* 120 Wis. 2d 402, 408–09, 355 N.W.2d 240 (1984).

In judicially construing a statute, the court looks to sources outside the language of the statute itself. *Marshall-Wisconsin Co.,* 139 Wis. 2d at 133. We examine the history, context, subject matter, scope and object of the statute. *Bee Frank,* 120 Wis. 2d at 409.[5] Whether inter-

---

[5]While the terms "interpreting a statute" and "construing a statute" often have been used interchangeably in case law, it seems more appropriate to use "interpreting" or a variant thereof only in reference to the initial consideration of the language of a statute and to use "construing" or a variant thereof only in refer-

preting or construing a statute, we do so in a way so as to avoid an absurd or unreasonable result under the facts and circumstances presented. *Id.*

We will first determine whether the language of sec. 66.296(2)(c), Stats., has a clear and unambiguous meaning. For a statute to be clear and unambiguous, its words, phrases and sentences must be subject to but one applicable meaning in the eyes of a reasonably well-informed individual. *Robinson v. Kunach,* 76 Wis. 2d 436, 444, 251 N.W.2d 449 (1977); *Guertin v. Harbour Assur.,* 135 Wis. 2d 334, 338, 400 N.W.2d 56 (Ct. App. 1986); *State v. Nixa,* 121 Wis. 2d 160, 164, 360 N.W.2d 52 (Ct. App. 1984).

A preliminary question in this regard relates to which portions of sec. 66.296(2)(c), Stats., referring to "abutting" landowners might possibly apply to Madison or Voss. Conceivably, the statute's reference to "owners abutting on the portion sought to be discontinued" is applicable. However, as the court of appeals intimated, *Voss,* 156 Wis. 2d at 269, the portion of the statute referring to "owners of more than one-third of the frontage of the lots and land abutting on that portion of the remainder thereof which lies within 2,650 feet from the ends of the portion to be discontinued; or which lies

---

ence to the consideration of the statute where we have determined that its meaning is unclear or ambiguous on the basis of the plain language and must be established by reference to outside sources. That is, "construction" is seen in this way simply as a second step in our process of ascertaining the intent of the legislature in a situation where our "interpretation" has shown that the meaning is not apparent from the language of the statute. These terms will be used as such for purposes of this case. The standard of review is *de novo* whether this court is engaging in judicial interpretation or judicial construction.

within so much of said 2,650 feet as shall be within the corporate limits of the city or village" does not apply to the situation presented here.

Madison argues that Madison and Voss are owners entitled to veto the vacation at issue in the instant case not only as direct "abutters" of the portion of Middleton Street sought to be vacated but also by virtue of being owners of more than one-third of the frontage of the lots and land abutting on that portion of the remainder thereof which lies within 2,650 feet from the ends of the portion to be discontinued. While Madison is correct as to the first possible basis of authority to challenge the vacation, it is mistaken as to the second. It misreads the statute, essentially "reading out" of the statute the phrase "within the corporate limits of the city," which phrase obviously applies to any owners who are not directly "abutting" on the portion sought to be vacated.

We reach this determination by applying the principle that a court should avoid interpreting a statute in such a way so as to render any portion surplus language. *County of Columbia v. Bylewski,* 94 Wis. 2d 153, 164, 288 N.W.2d 129 (1980). If we were to follow Madison's reasoning, a significant portion of the statute would be rendered surplusage. That is, the phrase "within the corporate limits of the city" would be unnecessary; indeed, it would not make much sense for the legislature to say that owners not directly "abutting" must be either: (1) within 2,650 feet; or (2) within 2,650 feet and at the same time within the corporate limits of the city. Clearly, the phrase "within the corporate limits of the city" applies to all landowners who are not directly abutting on the portion of a street sought to be vacated. While the legislature might have set forth the statute more clearly in this regard, the statute is not unclear or

ambiguous as it is set forth. Considered within the context of this case, the interpretation this court has given the statute "avoids an absurd or unreasonable result."[6]

Because Madison and Voss do not own any property in Middleton for purposes of this case, it is clear that the only portion of sec. 66.296(2)(c), Stats., that conceivably applies to Madison or Voss is that portion which refers to "owners abutting on the portion [of a street] sought to be vacated." Thus, we now consider whether this portion considered in and of itself has a clear and unambiguous meaning. Looking at the language of this portion of the statute, we find it clear and unambiguous and conclude that neither Voss nor Madison is an "owner[ ] abutting on a portion [of a street] sought to be vacated" under the statute with a right to veto Middleton's vacation of Middleton Street. There being no disputed question of fact, we hold that summary judgment was properly granted in Middleton's favor by the trial court.

As the parties agree, the word "abutting" in particular is of central importance to the meaning of sec.

---

[6] We emphasize that this determination is limited to the precise facts and circumstances of this case. Conceivably, for example, if in a different case a municipal vacation such as that which is at issue here were to "landlock" a landowner, the statute might have to be interpreted or construed differently so as to avoid an absurd or unreasonable result.

We also note that while what is designated as "Middleton Street" in Madison now exists as a "street," there nevertheless remains a question as to whether any portion of "Middleton Street" in Madison could be considered to constitute a "remainder" under the statute for purposes of this case. Because of the particular determination here that Madison and Voss can be, at most, owners of land directly "abutting" on the portion of Middleton sought to be discontinued, this court need not and does not reach this additional question.

752

66.296(2)(c), Stats. for our purposes. A verb, "abut" implies a direct relationship between an "abutter" and an "abuttee." Obviously, under the statute, the actors in this relationship are an "owner" of land and a "street." Given this court's previous determination that under sec. 66.296 a "street" is a "public way used for purposes of travel," *Poff v. Lockhart,* 21 Wis. 2d 575, 580, 124 N.W.2d 636 (1963), it is apparent that the relationship between the owner and the street must somehow relate to travel involving the owner and the street. We conclude the legislature intended "abutting" to pertain in a significant way to such travel.

This conclusion is supported by reference to the historical roots of the word "abut" in the English language. Specifically, "abut" is based upon the Old French *abuter,* which means to buttress. *American Heritage Dictionary of the English Language* (1980).[7] "Buttress," in turn, can be defined as "support" or "sustain." Clearly, "abutting" in sec. 66.296(2)(c), Stats., does not pertain to any *physical* buttressing of a street; rather, "abutting" as used in the statute obviously is meant to refer to some sort of supporting or sustaining of travel on the street.

This meaning is also supported by considering the fact that, had the legislature intended to focus in sec. 66.296(2)(c), Stats., merely on some physical touching of

---

[7]While the dissent notes the importance of considering a word in its etymological sense, dissent at 771 n.3, the dissent's dictionary definitions of "abutting" do not include any reference to the historical development of "abutting" in the English language, *see* dissent at 769, as does the definition given by the majority. In any case, the dissent's dictionary definitions are of secondary value given the majority's determination above that "abutting" means that there is travel involving the owner of the land and the street.

lands, as the plaintiffs suggest, the legislature could easily have done so by using the word "touching," which word imparts no particular meaning as does "abutting." Alternatively, the legislature could have used the words "adjoining" or "on each [and every] side thereof," for example, as it did in sec. 80.32(3), which relates to reversion of title after a highway has already been discontinued. Significantly, these words are used in sec. 80.32(3) to refer to a situation wherein there no longer exists any relationship between a landowner and a public way in terms of travel. In contrast, in secs. 80.02 and 80.47, dealing with existing highways and thus involving a situation wherein there exists such a relationship, the legislature uses the word "abutting." By this selective use of the word "abutting," then, the legislature has shown that the word relates somehow to the supporting or sustaining of travel.

Thus, it is clear and unambiguous from the language of sec. 66.296(2)(c), Stats., that to be an "abutting" owner under the statute means, at the very least, to be somehow supporting or sustaining of travel on the street in issue. In other words, where a landowner is not somehow supporting or sustaining travel on the street, he is not an "abutting" landowner under the statute.

A landowner's supporting or sustaining of travel on a municipal street can be considered to involve financial considerations. For one thing, landowners in any given municipality are financially responsible for maintenance of and improvements to the municipality's streets; a landowner within a given municipality whose land is deemed to "abut" a municipal street can be charged a special assessment by the municipality for local improvements to the street. In contrast, a landowner outside of a given municipality ordinarily cannot be so

specially assessed for street improvements in that given municipality, sec. 66.65(1), Stats.

While the precise facts and circumstances presented by this case have never before arisen in Wisconsin, there is a case from another jurisdiction, *Good Deal of Ivy Hill, Inc. v. City of Newark*, 32 N.J. 263, 160 A.2d 630 (1960), which case factually speaking is largely indistinguishable from the instant case. In *Good Deal*, a city barricade had been standing for some 15 years at a street that had a dead-end at the border. The land opposite the dead-end was leased by the plaintiff for purposes of operating a supermarket. Neither the plaintiff nor its predecessors as owner had ever had direct access to the dead-end street but did have and use an alternative means of ingress and egress, which was the main entrance to the market. The New Jersey Supreme Court said that in its judgment, "the test to be applied [in such a case] in deciding if plaintiff is an abutting owner, is whether its property would be subject to assessment for construction or improvement of the street." *Good Deal*, 32 N.J. at 269. The court went on to hold that the property owner was not an abutter and thus could not force the city to remove its barricade or prevent the city from vacating a portion of the street. *Id.* at 272. In reaching its holding, the court said:

> Undoubtedly, a local governing body may build a road and terminate it at the boundary line of the municipality, or some distance short of that line. There is no duty to go further in order to provide access to the road for a citizen of the adjoining community whose land is just beyond the geographical limit.

*Id.* at 267.

As the court explained:

> Plaintiff's property is foreign to [the city], its lessor-owner could not be burdened with an assessment for opening or improving the street, and he has no easement rights therein. As a logical consequence of these factors neither plaintiff nor his lessor could defeat vacation of the [street].

*Id.* at 269–70. Finally, reaching its conclusion, the court observed that:

> '[T]he question arises why an owner of property outside the limits of the city should have the right to control the lawful exercise of the powers of the municipal authorities.'

*Id.* at 271, *quoting Thomas v. Jultak,* 68 Wyo. 198, 231 P.2d 974, 986 (1951).

This court considers *Good Deal*'s disposition of the issue to be the proper one. The record indicates that neither Madison nor Voss own any property in Middleton that is relevant to this case. The property they do own and which is in issue here is outside of the city limits of Middleton. They never have had the particular access to Middleton Street that they now desire. In addition, they enjoy ingress to and egress from the property in question within the city limits of Madison. Moreover, as owners of the property in issue, Madison and Voss have done nothing, at least in financial terms, to support and sustain any improvements to or maintenance of Middleton Street in Middleton. Given the determination that the supporting or sustaining of travel on the street in question is inherent in being an "abutting" owner under sec. 66.296(2)(c), Stats., it is clear that neither Madison nor Voss is an "abutting" owner under the statute. Insofar as they are not "abutting" owners, they have no basis to veto the vacation of Middleton Street.

Additional authority from other jurisdictions, although sparse, supports a conclusion that, under facts and circumstances such as are present here, neither Voss nor Madison is an "abutting" landowner under the statute and that therefore neither can veto the vacation of Middleton Street. *See Crenshaw v. City of Belle,* 571 S.W.2d 234 (Mo. 1978); *House v. City of Greenburg,* 93 Ind. 533 (1833). For its part, Madison does not attempt to refute the applicability here of *Good Deal, Thomas, Crenshaw,* and *House.* While, as the court of appeals noted, *Voss,* 156 Wis. 2d at 273 n.4, *Crenshaw* may in some ways be distinguishable, we note that Madison has not put forth and there appears not to be any case which in fact and circumstance approaches the situation in the instant case while also supporting the plaintiffs' position.

*Royal Transit,* 266 Wis. 271, put forth by Madison as persuasive authority in its favor, is distinguishable. In *Royal Transit,* as in the instant case, the land in question was situated at the end of a "dead-end" street, having a boundary line in common with it, and the landowner had access to its land from a side of the land other than the side partly bounded by the dead-end street, where the land had frontage along the side of a street. The city erected a barricade at the dead-end at the boundary line, so as to deny the plaintiff access to its land from that particular street.

Unlike the situation in the instant case, however, the plaintiff's land was situated within the same municipality as the portion of the street in question. Accordingly, the landowner in *Royal Transit,* insofar as it was subject to municipal taxation and to any special assessments with respect to the street, in a real sense was supporting and sustaining travel on the street. That is to say, in a real sense it was "abutting" the street. The

757

court thus ruled in favor of the plaintiff, holding that the municipality had no right to deprive the plaintiff of continued access to its property from the dead-end street. *Id.* at 277. Had the court not done so, the plaintiff's historic access to the street, which street was constructed and maintained on the basis of municipal funds essentially received from landowners including the plaintiff, would have been unfairly terminated.

Moreover, *Royal Transit* points to a completely different sense in which the plaintiffs here cannot be considered to be within the legislative intent of sec. 66.296(2)(c), Stats. That is, as far as a landowner under the statute is concerned, supporting or sustaining travel on a street unquestionably involves the matter of, more practically speaking, supporting or sustaining *access* from the land to the street. The court essentially said this in *Royal Transit.* Specifically, while the issue in *Royal Transit* was initially framed in terms of whether the landowner was "an owner of land abutting on any . . . street" under sec. 80.47, Stats., and while the court indicated that "abutting" is consistent with there being "no land interven[ing] between the land of the abutter and the street," the court also stated that there was "but one question involved, that of plaintiff's right of *access* to [the street in question]." *Id.* at 273-74 (emphasis added). There is no apparent reason why sec. 66.296(2) should be considered as any different from sec. 80.47 in this regard. Indeed, in *Miller v. City of Wauwatosa,* 87 Wis. 2d 676, 686, 275 N.W.2d 876 (1979), a case involving a relocation and not a vacation of a street, the court indicated that sec. 66.296(2) is "designed to protect abutting landowners from the loss of access to a [street]." *Id.* at 688.[8]

---

[8]There may be cases where things other than access as such determine, at least in some way and to some degree, whether or

Under the facts and circumstances presented here, it is clear that neither Voss nor Madison is able to support or sustain a claim of access to any street in question, and neither has any right to do so. It follows for purposes of this case that, in this practical sense also, neither is an "abutting" owner under sec. 66.296(2)(c), Stats.

With respect to Voss, he has no access or any right thereof with respect to Middleton Street insofar as his land has only a single pinpoint contact with it.[9] As the court essentially indicated in *Royal Transit,* 266 Wis. at 274, " 'where there is no physical connection between the lotline and the streetline,' " the owner of the lot has no right of access to the street, *quoting* McQuillin, Municipal Corporations (3d ed.), p. 657, sec. 30.55. It follows that where there exists no such connection of lines but only a point as the basis for any physical connection, there is no right of access.

---

not one is an "abutting" owner. In *Miller,* for example, we indicated that, among other things, light, air and view from a street, in addition to access, may be involved in "abutting" in any given case. However, such a situation was clearly not present in *Miller,* and the parties have not suggested such a situation is present here. For purposes of this case, we shall define "abutting" as we have *supra, i.e.,* in terms of supporting or sustaining claims involving travel and access.

[9]One of Madison's lots in question here also touches Middleton Street at only a single pinpoint. For the sake of simplicity, however, we will refer only to Voss's lot in this analysis. The discussion of Voss's property will also be applicable to that one property of Madison's which touches Middleton Street at a single pinpoint, although it is not meant to address specifically Madison's other property of concern in this case, which will be discussed *infra.*

759

Viewed from a practical standpoint, this conclusion is obvious. It is impossible for Voss to use his pinpoint connection to access Middleton Street from his land without trespassing upon the property of another. Because one who is forced to trespass upon another's property in order to access a street has no right of access, *Surety Savings & Loan Assoc. v. State,* 54 Wis. 2d 438, 444, 195 N.W.2d 464 (1972), it is clear that Voss has no right of access. Other courts facing the same question have reached essentially the same result. *See Lincoln v. Cather & Sons Construction, Inc.,* 206 Neb. 10, 17, 290 N.W.2d 798 (1980). Thus, because for all practical purposes his pinpoint connection with Middleton Street does not allow him any access to it, Voss is not an "abutting" landowner in this regard.

As to the situation presented by Madison, we find that Madison, like Voss, is not even in a practical sense an "abutting" owner under sec. 66.296(2)(c), Stats. Madison does not, practically speaking, support or sustain access to any street in question.

Although Madison's property line does touch Middleton Street along its endline and not just at a single point, this does not mean that the property is "abutting any portion [of a street]" for purposes of this case.[10] Primarily, this is so because of the barricade that for purposes of this case has existed for years along the end of Middleton Street along its border with Madison.[11]

---

[10]Had we not already disposed of Voss's claim independently as to his not supporting or sustaining access to the street in any practical way on the basis of his land's pinpoint contact with Middleton Street, this could be applied to Voss as well.

[11]Madison itself expressly stated in its brief that the barricade for the purposes of this case has always existed at the end of Middleton Street at approximately the intermunicipal border. In

Manifestly, the end of Middleton Street physically precludes the passage of traffic through the municipal boundary and into Madison, precisely because at that location Middleton Street is simply a barricade and not a portion of a "street" as such under sec. 66.296, Stats., given the relevant definition of "street" in *Poff,* 21 Wis. 2d at 580, as a "public way used for purposes of travel." Madison is "abutting" simply a barricade; it is not, however, abutting a "street." In other words, no "street" exists at the point where Madison's property touches Middleton Street. To use *Royal Transit*'s language, the barricade and its base at the end of Middleton Street constitute some dimension of "land interven[ing] between the land of the abutter and the street"; there is no "physical connection between the lotline and the streetline," and this has been of practical import to Madison. *Royal Transit,* 266 N.W.2d at 274. *See Good Deal,* 32 N.J. at 267 (barricaded portion, regardless of whether it stands at municipal boundary or, for example, ten feet short of it, should be considered in essence "land intervening").

Madison's words, "[Middleton] placed the barricade at the end of Middleton Street back when the Middleton terminus of the street was built in 1970." This statement reflects our reading of the record on this point. While it appears in reality that some small portion of the barricade intruded over the border and was located in Madison, the dissent is mistaken in suggesting this is in any way relevant to this case. *See* dissent at 779 n.7. As the above quotation from Madison's brief indicates, Madison did not argue this matter in addressing itself to the merits of this case; at one point in its brief, it even said to "never mind" the fact of the intrusion.

In effect, the "street" ended several feet before the barricade at the end of Middleton Street,[12] such that Madison did not even touch any "street" in question, let alone "abut" one. Because a property owner has no right of access where a street does not exist but would abut his land if it did exist, *Wisconsin Town House Builders, Inc. v. City of Madison,* 37 Wis. 2d 44, 50, 154 N.W.2d 232 (1967), it is clear that Madison has no right to support or sustain access to the street. *See also* 10A McQuillin, Municipal Corporations, sec. 30.56.10 at 371 (3d ed. 1990) (indicating the general rule that proprietary rights of an abutter do not begin until street is opened for use as such). This also comports with the rule of *Surety Savings & Loan* mentioned above, which rule says that no right of access exists if the property owner is unable to access the property without essentially trespassing on the property of another, as Madison would need to do here. Middleton in effect can be said to hold Middleton Street at the location of the barricade in a proprietary capacity and not as a public easement. *See Horn v. People,* 26 Mich. 221 (1872) (wharves, whether terminating highways or not, are not highways but private property; title thereto, whether owned by city or not, is proprietary and not a public easement).

Significantly in this regard, the barricade was built as, and always has been, an integral part of the portion of Middleton Street in question here. Thus, Middleton Street at the location of the barricade has always been the antithesis of what constitutes a "street." That is to say, the very purpose of Middleton Street at the location in question has never had anything to do with allowing

---

[12]At this point, all traffic traveling on Middleton Street in the direction of Madison would as a practical matter have to cease.

for travel; rather, Middleton's intention always has been to *block* travel, not to hold out the very end of Middleton Street as a public way. *See State v. Toledo,* 75 Ohio App. 378, 62 N.E.2d 256 (1944) (intentions and plans of government authority and historic use to which public property has been put determine that property's character).

Again, *Royal Transit* does not prevent and in fact endorses this result. Unlike the situation in the instant case, the landowner in *Royal Transit* freely accessed its land from the dead-end street and did so for many years. The landowner in *Royal Transit* had for purposes of the case *always* been able to access its land from the dead-end street until the municipality erected the barricade so as to physically prevent the landowner from doing so. As a practical matter, such active use of the street gave the landowner a right to access where none otherwise would have existed, rendering the landowner an "abutter." In contrast, in the instant case, for almost 20 years, ever since the barricade's construction as part of Middleton Street, neither Madison nor anyone else ever sought access beyond the end of Middleton Street or challenged the barricade as a street obstruction under sec. 80.47, Stats. Madison never supported or sustained the access it now desires, and it never indicated until the start of this matter that it thought it might have a right to such access.

In this regard, we note that an underlying theme of sec. 66.296(2)(c), Stats., is obviously to protect property owners from losing *existing* access and rights thereto; the statute is not intended to provide landowners some legal basis to establish possible access or a right to access at some point in the future. This theme, obvious from the statute itself, also was made apparent in *Miller,* 87 Wis. 2d at 688, in which the court noted that:

> The procedure for notice, hearing and objection set out in sec. 66.296(2), Stats., is designed to protect abutting landowners from the *loss* of access to a public highway. Where alteration poses no such danger no reason exists to allow a single abutting landowner to block an improvement.

(Emphasis added.) The court also said that "[t]he right of access and the expectation of *continued* existence as a public way are involved where a discontinuance is proposed." *Id.* at 687. (Emphasis added.)

The importance of there being existing access and a right thereof has been recognized previously by other courts. In discussing the meaning of "abut" in a special assessment challenge, the court in *Schiff v. City of Columbus,* 4 Ohio App. 2d 234, 237, 211 N.E.2d 917 (1965) said that:

> As a general proposition, it is enough that the property share a common boundary with the right of way rather than with the improvement . . .. However, this assumes that the owner has free and unimpeded access to the improvements over the intervening areas.

We agree with this view within the context of this case.

Specifically concerning *Miller,* while it involved a street relocation rather than a street vacation, the general statements set forth above are useful in considering the situation in the instant case. That is, given *Miller's* illustration of the fact that a purpose of sec. 66.296(2), Stats., pertains to protecting existing access and rights thereto, something which Madison never has had, it is clear that Madison is not *losing* anything that it can claim by the relevant statute. This clearly differentiates this case from the situation in *Royal Transit.* Madison as a property owner has not shown itself to have any

rights that it is in danger of losing in relation to Middleton's regulation of Middleton Street.[13]

Finally, in *Royal Transit,* the property owner plaintiff was a private party seeking to use its property only for private business purposes, and there is no indication that these purposes in any way substantially threatened the rights of other property owners "abutting" on the street. In contrast, Madison is a municipality, and Madison makes no secret of the fact that it seeks to be determined to be "abutting" under the statute so that it can in effect re-make Middleton Street into a major public way that would pass directly through the municipal boundary, extending through both Middleton and Madison. In practical terms, there is a meaningful difference in claiming access to what amounts to a driveway and seeking access that would inundate Middleton with up to a twenty-fold increase in traffic on Middleton Street and initially cost Middleton taxpayers upwards of $50,000.[14] While any landowner has certain rights that inhere in his or her land, even "abutting" landowners cannot access their land in a way that would be substan-

---

[13]This conclusion is consistent with our treatment of cases of claimed compensation when access rights are restricted or removed. For example, when a controlled access road is built pursuant to sec. 84.25, Stats., unless the road takes away *existing* access rights to the highway, compensation is not payable to the abutting property owner. *Wisconsin Town House Builders v. Madison,* 37 Wis. 2d 44, 154 N.W.2d 232 (1967).

[14]Although Madison apparently disputes that Middleton would be forced to spend this or any additional sums to handle the heretofore non-existent traffic that would pass through Middleton Street in Middleton to and from Madison were Middleton Street to become a through street, it is indisputable that Middleton would, at the very least, have the expense of once again reconfiguring the end of Middleton Street and removing the barricade so as to accommodate Madison.

tially detrimental to other "abutting" owners. 10A McQuillin, sec. 30.54 at 356. Here, it is quite clear that Madison's proposed actions would, as a matter of law, injure actual "abutting" owners, to say nothing of the fragile ecosystem of Stricker's Pond and the sense of confidence and responsibility with which municipalities will deal with each other in establishing and carrying on at least informal agreements to cooperate on development along their common borders. It clearly is possible that Middleton was considering such matters when it decided to vacate the portion of Middleton Street in question.[15]

---

[15]We would also note that our decision has the effect of avoiding the "less-than-desirable results" that the court of appeals recognized were caused by its decision. *Voss,* 156 Wis. 2d at 274. The court of appeals wrote:

> It is obvious, for example, that the City of Middleton and its residents—particularly those living along Middleton Street—uniformly prefer the existing dead end just north of the Madison line. The record also suggests that, basically, the same is true for those who have purchased lots along the extension of Middleton Street in the Voss plat. It also appears that a projected twenty-fold increase in vehicular traffic on Middleton Street, once it becomes a through street, will not only destroy the quiet atmosphere of the neighborhood but will also require the City of Middleton to expend significant sums of money to improve the street to handle the increased traffic. Additional concerns have been expressed about the effect of that increased traffic—and the additional pressures for development arising from the existence of a through street in the area—on a nearby pond which Middleton has already expended substantial sums to improve and protect.
>
> Finally, as we have noted above, Voss's original preliminary plat for the area showed the Madison portion of Middleton Street ending in a cul-de-sac, and this plat was furnished to Middleton officials. Several years later, when Voss amended the plat to show the through street, neither Voss nor the City of Madison furnished any information on the changes to Middleton prior to the plat's preliminary approval, despite a prior agreement between the two cities that they

 This conclusion comports with the generally held maxim that the rights of landowners with respect to a street are subject to the power of the municipality to regulate streets. 10A McQuillin, sec. 30.63 at 382. Indeed, the regulation of its streets is a matter of local affairs as to which, under art. XI, sec. 3 of the Wisconsin Constitution and ch. 62, Stats., a municipality generally is entitled liberal construction in its favor. *See Wisconsin Town House Builders,* 37 Wis. 2d at 50 (given the existence of municipal police power, absence of particular provisions regulating exercise of that power in certain respects does not imply the negation or nonexistence of the police power in those respects). Specifically, we would note that, under its police power, a municipality may restrict the flow of traffic in residential areas, which includes the right to restrict certain street uses with barricades. 10A McQuillin, sec. 30.63, at 383–84; *Deutsch v. Ladue,* 728 S.W.2d 239 (Mo. App. 1987). This is consistent with the previous indication by this court to the effect that, at least in a few rare cases, some streets might exist so completely within a city's jurisdiction so as to allow the city complete control over the street. *See State ex rel. Welch v. Chatterton,* 239 Wis. 523, 528, 300 N.W.2d 922 (1942). Finally, with respect to a municipality in Madison's position in the instant case,

would share information in a timely manner about proposed developments near their common border.

The net result of all this is that the City of Madison and the developer, Voss, can impose their desire to route large amounts of vehicular traffic through a quiet, established residential area regardless of the objections of area residents on both sides of the Middleton-Madison border, and despite the wishes of the municipality proposing the street vacation, and, further, despite the additional expenses and possible detriment to natural resources in the area caused by that traffic.

It is anything but a happy result . . ..

the court's conclusion comports with the rule that municipalities may not exercise any powers extraterritorially without express statutory authorization, *Wis. Environmental Decade, Inc. v. DNR,* 85 Wis. 2d 518, 533, n.8, 271 N.W.2d 69 (1978), although Madison has not argued that it has in any way been authorized as a city to veto Middleton's vacation of Middleton Street.

Having determined that neither Madison nor Voss is in any meaningful sense supporting or sustaining travel nor claiming historical access on any street relevant to this case, it is clear that neither is an "abutting" landowner under sec. 66.296(2)(c), Stats., and that therefore neither has any right to veto any vacation of Middleton Street, there being no other basis for a veto in this case than that statute. The holding here is limited to the precise facts and circumstances of this case. There being no issues of material fact in dispute, the decision of the court of appeals is reversed and the trial court's summary judgment in favor of Middleton is reinstated.

*By the Court.*—The decision of the court of appeals is reversed.

CHIEF JUSTICE HEFFERNAN (dissenting). Because the city of Madison's property clearly "abuts" on the portion of Middleton Street sought to be discontinued by the city of Middleton, Madison, as a property owner, had a statutory right to veto Middleton's discontinuance, pursuant to the unambiguous terms of sec. 66.296(2)(c), Stats. Accordingly, I dissent.

The well established rules of statutory construction must be emphasized. The purpose of statutory construction is to give effect to the intent of the legislature. *County of Columbia v. Bylewski,* 94 Wis. 2d 153, 164, 288 N.W.2d 129 (1980). In determining legislative intent, however, first resort must be to the language of the stat-

ute itself. *State v. Derenne,* 102 Wis. 2d 38, 45, 306 N.W.2d 12 (1981). Absent statutory definition, words are to be construed according to their ordinary and accepted meaning, which may be established by dictionary definition. *State v. Gilbert,* 115 Wis. 2d 377–78, 340 N.W.2d 511 (1983). "A statute should be construed so that no word or clause shall be rendered surplusage and every word if possible should be given effect." *Donaldson v. State,* 93 Wis. 2d 306, 315, 286 N.W.2d 817 (1979). "If the meaning of the statute is clear and unambiguous on its face, resort to extrinsic aids for the purpose of statutory construction is improper." *State v. Denter,* 121 Wis. 2d 118, 123, 357 N.W.2d 555 (1984).

The majority's proffered construction of sec. 66.296(2)(c), Stats., ignores these rules. Madison is clearly an "abutting" landowner under the plain and unambiguous terms of the statute. According to Webster's *Third New International Dictionary,* p. 8 (1965), the word "abut" is defined as, "to border on: reach or touch with an end (two lots that [abut] each other.)" Similarly, *Black's Law Dictionary,* p. 11 (6th ed. 1990), defines the word "abut" as:

> To reach; to touch. To touch at the end; be contiguous; join at a border or boundary; terminate on; end at; border on; reach or touch with an end. The term "abutting" implies a closer proximity than the term "adjacent." No intervening land.

The majority's assertion that property is not "abutting" under sec. 66.296(2)(c), Stats., solely due to its physical proximity to a discontinued street (majority op. at p. 752) is directly contrary to the common and well accepted meaning of that term. The legislature did not need to use terms such as "touching" or "adjoining" to convey this meaning, because the ordinary usage of the

769

word "abut" clearly and unequivocally carries such a meaning. In interpreting the very same word, "abutting," in another statute declaring the rights of abutting property owners,[1] this court in *Royal Transit, Inc. v. West Milwaukee,* 266 Wis. 271, 274, 63 N.W.2d 62 (1954), adopted and applied the definition found in 10 McQuillin, *Municipal Corporations,* sec. 30.55, p. 657 (3rd ed.), which set forth what abutting property is:

> When no land intervenes between the land of the abutter and the street, his property is said to 'abut.' If the property does abut, the lotline and streetline are in common. Of course, where there is no physical connection between the lotline and the streetline, the owner of the lot is not an abutter.

There is absolutely no dispute that Madison's property touched and bordered Middleton Street and that no land intervened between the two. As the unanimous court of appeals decision properly concluded, sec. 66.296(2)(c), Stats., is clear and unambiguous and this court need not look outside the statute to ascertain the meaning of the word "abut." *See Voss,* 156 Wis. 2d at 275.

The majority, however, has read into this statute a multi-faceted balancing test to be applied on a case-by-case basis when determining whether a property owner is an "abutter." A court's construction of "abutting," in the view of the majority, should now include such factual considerations as whether the putative "abutter" (1) was

---

[1] The statute at issue in *Royal* was sec. 80.47, Stats., which provided in relevant part that:

> The owners of land abutting on any highway, street, or alley shall have a common right in the free and unobstructed use thereof to its full width . . .

*See Royal,* 266 Wis. at 273.

located within the municipality where the street was to be discontinued and paid taxes to that municipality, (2) can establish a history of prior use and access to the street to be discontinued, and (3) will not threaten the peace and serenity of the area surrounding the street to be discontinued by exercising his or her statutory right to veto such discontinuance and cause some increase in traffic by using the street.

This court's role is to apply statutes as written by the Wisconsin legislature, not to find requirements which appear nowhere within the four corners of the statute. *See State v. Richards,* 123 Wis. 2d 1, 12, 365 N.W.2d 7 (1985).[2] It is unnecessary to examine the scope, history, and context of such an unambiguous statute to discern legislative intent. *See Rice v. City of Oshkosh,* 148 Wis. 2d 78, 84, 435 N.W.2d 252 (1989).

This court's statutory construction of the synonymous term, "adjoining,"[3] in *State ex rel. Badtke v. School Board,* 1 Wis. 2d 208, 83 N.W.2d 724 (1957), is instructive. In *Badtke,* the appellants contended that certain territory did not "adjoin" a school district as that word was used in an annexation statute, because the two properties only touched each other in two places by the corners. *Id.* at 211. Citing prior Wisconsin case law dis-

---

[2]The majority's dual conclusions that sec. 66.296(2)(c), Stats., is "clear and unambiguous" (majority op. at p. 752), and that the statutory term "abutting" depends on these various additional considerations are irreconcilable. Both the City of Middleton and the trial court found it necessary to conclude that the statute was ambiguous in order to read these extraneous factors into the statute.

[3]*See Black's Law Dictionary, supra* at 41, defining "adjoining" as follows (with emphasis supplied): "The word in its etymological sense means touching or contiguous, as distinguished from lying near to or adjacent. To be in contact with; *to abut upon.*"

771

tinguishing the term "adjoining" from "adjacent," this court ruled that lands which touch each other at a common corner where a third body does not intervene between the two are adjoining lands under the statute. *Id.* at 212. In spite of the fact that the statutory terms were literally followed, however, the appellants in *Badtke* persisted in voicing various policy concerns such as the burden of taxation. *Id.* at 212-13. This court rejected such equitable pleas because the statute was clear on its face. We stated:

> Appellants have a good deal to say about the intention of the legislature. The statute is plain and unambiguous. Therefore, ". . . interpretation is unnecessary, and intentions cannot be imputed to the legislature except those to be gathered from the terms of the law." *Estate of Ries* (1951), 259 Wis. 453, 459, 49 N. W. (2d) 483, 50 N. W. (2d) 397. If, as appellants submit, the legislature meant something other than it said, the remedy is not in the courts which can deal only with the legislative mandate as that body gave it. Modifications of the statute if it works badly or in unexpected and undesirable ways must be obtained through legislative, not judicial action.

*Badtke,* 1 Wis. 2d at 213.

The City of Middleton, like the appellants in *Badtke,* has urged this court to look outside the unambiguous terms of a statute and consider equitable factors. Contrary to well established precedent, here the majority has yielded to Middleton's policy arguments and overstepped the bounds of judicial authority by applying an inappropriate legislative gloss. Moreover, had the majority conducted a historical analysis of sec. 66.296, Stats., and the time-honored statutory rights of abutters to veto street discontinuance, it would have found support only

for the conclusion that the legislature never intended that a multi-faceted balancing test should control the determination of whether a landowner is an abutter.

As a general matter, it must first be noted that it is the state of Wisconsin and not its cities and municipalities which has absolute control of streets. "Aside from its police or regulatory power, the only power a city has over the use of the streets must be delegated to it by the state." *Madison v. Reynolds,* 48 Wis. 2d 156, 158, 180 N.W.2d 7 (1970).

Various powers, of course, have been expressly conferred by the Wisconsin legislature on cities through statutory enactments. *See Milwaukee v. Milwaukee & Suburban Transport Corp.,* 6 Wis. 2d 299, 309, 94 N.W.2d 584 (1959). One of these is the general municipal power to vacate or discontinue streets. But as this court explained many years ago: "[W]here a public street or alley has been legally established, it can only be vacated, if at all, in the manner prescribed by statute." *Johnston v. Lonstorf,* 128 Wis. 17, 23, 107 N.W. 459 (1906). A city's power to vacate a street is statutory only and must be exercised according to the express provisions set forth by the legislature.[4] *See City of Ashland v. Chicago & Northwestern R. Co.,* 105 Wis. 398, 404, 80 N.W. 1101 (1900); *see generally* 39 Am. Jur. 2d, *Highways, Streets, and Bridges,* secs. 143, 146 (1968).

The statutory provisions in this case derive from sec. 904, Stats., originally enacted by sec. 64, ch. 188, Laws 1872, which permitted a village to discontinue a

---

[4] The legislature, however, did historically allow certain classes of cities to vacate or discontinue streets based on a method established in the city charter. *See State ex rel. Manitowoc Land & Fuel Co. v. Kelley,* 167 Wis. 91, 95, 166 N.W. 782 (1918). In the case before us, the City of Middleton's discontinuance was based only on the statutory provisions of sec. 66.296, Stats.

street "[u]pon the petition in writing of all the owners of lots or land *on* any street" (emphasis supplied). *See* ch. 40, sec. 904, Stats. (1878); *see also James v. City of Darlington,* 71 Wis. 173, 174–75, 36 N.W. 834 (1888). Undoubtedly recognizing the potential difficulty of obtaining the consent of all the landowners on a street, sec. 904 was amended by ch. 174, Laws 1891, to permit a street's vacation upon the petition of "all the owners of lots or land on the portion of such street or alley proposed to be vacated and two-thirds of the owners of lots or land on the remainder thereof." *See* sec. 904, Stats. 1898; *see also Baines v. City of Janesville,* 100 Wis. 369, 374, 75 N.W. 404, 76 N.W. 481 (1898).

The legislature was apparently still not satisfied with the cumbersome discontinuance scheme, and sec. 904 was repealed and re-enacted by ch. 517, Laws 1911. The new statute permitted municipalities to discontinue streets upon the petition of the owners of:

> . . . all the frontage of the lots and lands *abutting* upon the portion thereof sought to be discontinued, and of the owners of more than one-half of the frontage of the lots and lands abutting on that portion of the remainder thereof, which lies within two thousand six hundred and fifty feet from the ends of the portion proposed to be discontinued. [Emphasis supplied.]

Section 904, Stats. 1911.

The discontinuance statute was subsequently renumbered to sec. 61.38, and the "veto power" of landowners located on the remainder of the street was again diminished by the legislature's enactment of ch. 421, Laws 1945. In addition to the required consent of all the landowners whose property abutted the portion of the street to be discontinued, the revised statute required the

consent only of one-half of the landowners abutting on the remainder of the street:

> which lies within 2,650 feet from the ends of the portion proposed to be discontinued, *or which lies within so much of said 2,650 feet as shall be within the corporate limits of said village.* [Emphasis to designate amended portion of statute.]

Section 61.38, Stats. 1945.

Thus, where the territory of the initiating municipality extended for less than 2,650 feet past the end of the discontinued street, the legislature only required the consent of half the abutters on the remainder of the street located within that municipality.

The statute was thereafter renumbered to sec. 66.296 and substantially modified by the passage of ch. 662, Laws 1951. Instead of permitting the discontinuance of a street only through the active petitioning of the various classes of abutters, the legislature once again liberalized the scheme by allowing the municipality's governing body to introduce a resolution on the discontinuance and then forcing any objecting abutters to step forth and affirmatively veto the discontinuance. *See* sec. 66.296, Stats. 1951.

The three classes of objecting abutters able to carry forth such a veto are now set forth at sec. 66.296(2)(c), Stats., and include: (1) "any of the owners abutting on the portion sought to be discontinued," (2) "the owners of more than one-third of the frontage of the lots and lands abutting on that portion of the remainder thereof which lies within 2,650 feet from the ends of the portion proposed to be discontinued," or (3) "the owners of more than one-third of the frontage of the lots and lands abutting on that portion of the remainder thereof . . . which

lies within so much of said 2,650 feet as shall be within the corporate limits of the city or village."

As demonstrated above, Madison's property is unequivocally "abutting" on that portion of Middleton Street sought to be discontinued by Middleton; and, accordingly, Madison is a member of the first category of abutters which can veto the discontinuance under sec. 66.296(2)(c), Stats. The fact that Middleton currently has a barricade erected on the street surface is wholly irrelevant; Madison's property line is contiguous to the end of Middleton Street. Land abuts land and not a structure placed upon it. Because it cannot be denied that Madison's property adjoins, touches, meets, comes together with, and is contiguous to the end of Middleton Street, Madison is an "abutting" landowner under the common and ordinary meaning of that statutory term. *See Clements v. City of Corpus Christi,* 471 S.W.2d 83, 85-6 (Tex. App. 1971); *Braden v. Board of Supervisors of Pottawattamie County,* 261 Iowa 973, 977, 157 N.W.2d 123 (1968) (construing statutory term "abutting").

Equally significant, the historical evolution of sec. 66.296, Stats., suggests that the legislature never intended that extraneous policy factors be considered when determining who an "abutting" property owner is under the first category of objecting abutters given statutory veto power. First and foremost, whether Madison's property was located within the municipal boundaries of Middleton and was subject to local taxation is wholly irrelevant. The legislature in defining the first category of objecting abutters has made no mention of the need to be within a city's corporate boundaries.

Although the absence of such a provision does not create ambiguity, any perceived ambiguity is dispelled by considering the legislature's designation of a third class

776

of objecting abutters who are the only ones to be expressly defined as located "within the corporate limits of the city or village." *See* sec. 66.296(2)(c), Stats. Under the rule of *expressio unius est exclusio alterius,*[5] we must conclude the legislature's express placement of such a "corporate limits" element in the third category of abutters as a complete alternative some 47 years after it had created the first two categories (which made no mention of corporate boundaries) to mean that the first two categories are not so limited.[6]

Moreover, as noted by the court of appeals, one cannot seriously question that the legislature has established a street discontinuance procedure which was meant to protect the rights of abutting landowners

---

[5]*See Whitaker v. State,* 83 Wis. 2d 368, 374, 265 N.W.2d 575 (1978).

[6]Because Madison belongs to the first category of abutters set forth in sec. 66.296(2)(c), Stats., it is unnecessary to address Madison's alternative claim that it also belongs to the second category of abutters on the remainder of the discontinued street. The majority's assertion that the "corporate limits" provision applies to both the second and third categories, however (*see* majority op. at 751–752), is erroneous. The legislature's only amendment to the statute in 1945 was the addition of the language: "or which lies within so much of said 2,650 feet as shall be within the corporate limits of said village." *See* ch. 421, Laws 1945. The use of the conjunction "or" unequivocally indicates that a separate alternative was established. The purpose of such an amendment was to facilitate the discontinuance of a street by only requiring the consent of abutting landowners *along the remainder* of the street located within the municipality. This is perfectly logical and proper by even common law standards, because the property of these landowners by definition does not abut the portion of the street to be discontinued, and hence no abutter's rights are at issue. *See* McQuillin, *Municipal Corporations,* secs. 30.54–30.55 (3rd ed. 1990).

located in an adjoining municipality. *See Voss,* 156 Wis. 2d at 273. While residents of separate municipalities only pay local taxes to their governing bodies, those owning property also abutting another municipality are placed in a vulnerable position. Given that abutting landowners on both sides of a municipal boundary line are in the same position, the state of Wisconsin through its legislature has expressly granted all abutting landowners a veto power over street vacation affecting their rights. As noted above, the state, and not the municipality, has ultimate power over streets. Although the state has delegated some of that power under sec. 66.296, the statute must be strictly followed.

Similarly, there is nothing in sec. 66.296(2)(c), Stats., to indicate that a landowner's prior use of the discontinued street should be considered when determining whether the owner is "abutting." The majority's discussion of an abutting landowner's "right of access" is irrelevant. *See* majority op. at 758, 763. The statute under consideration here can be sharply contrasted to the "abutting" landowner provisions of one of the "eminent domain" statutes. Section 32.09(6)(b). That statute, which concerns the determination of just compensation when there is a partial taking of property, expressly considers a demonstrable "[d]eprivation or restriction of existing right of access to highway from abutting land." The ability to veto a street discontinuance under sec. 66.296(2)(c), on the other hand, does not require any showing of a "deprivation or restriction of existing right of access."

The fact that Madison's property physically abuts or adjoins the end of Middleton Street, moreover, in and of itself gives rise to a common law right to the free and unobstructed use of that street. *See Miller v. City of Wauwatosa,* 87 Wis. 2d 676, 686-87, 275 N.W.2d 376

778

(1979); *Royal,* 266 Wis. at 274. This court has long held that the right of an abutting landowner to use a street or alley is determined by the public character of that way and not by "the number of persons who choose to exercise that right." *See Johnston,* 128 Wis. at 22 (quoting Elliott, Roads & Streets (2d ed.), secs. 23, 24, 25).

Any discussion of an alternative "reasonable expectation of access" requirement, as proposed by the City of Middleton and trial court, is equally inappropriate when dealing with the intent of the legislature. Again, the plain and unambiguous terms of the statute do not contemplate this. Even if the legislature had placed such a consideration in sec. 66.296(2)(c), Stats., it cannot seriously be denied that virtually every owner of undeveloped property abutting a street would reasonably expect to have access to that street if and when his or her property became developed. It is legally untenable to suggest that owners of undeveloped land are in a race against time to use an abutting street or lose their veto power under sec. 66.296(2)(c).

In this regard, it must also be recognized that Middleton's use of a barricade to block the end of the street is of no importance.[7] The statute here, sec. 66.296, Stats., concerns the procedure for discontinuing streets, not the propriety of a municipality's placement of a barrier under its police power which might also affect an abutting landowner's common law rights to free and

---

[7]The majority's "barricade" argument (*see* majority op. at 760–763) fails as a matter of fact. Middleton's engineering staff established that the barrier placed at the end of Middleton Street since 1970 was located within the City of Madison. The barrier was not relocated to the street's end within Middleton until after Voss and Madison filed their written objections pursuant to sec. 66.296(2)(c). Clearly, Madison had access to Middleton Street from its property for over 16 years.

unobstructed access to the street. *See Royal,* 266 Wis. at 277. *See also Quaglia v. Incorporated Village of Munsey Park,* 54 A.D.2d 434, 389 N.Y.S.2d 616, 618-20 (1976), *aff'd* 377 N.E.2d 473, 44 N.Y.2d 772, 406 N.Y.S.2d 30 (1978) (property owner abutting street in another municipality which is blocked off by barricade has right to have street remain unobstructed).

Finally, the fact that Madison's veto of the street discontinuance might lead to a significant increase in traffic on Middleton Street is likewise not a legislatively recognized consideration under the statutory mandates of sec. 66.296(2)(c), Stats. While the increase in traffic would undoubtedly affect the tranquility associated with living at the end of a cul-de-sac, the statutory procedure does not permit a judge to balance the pros and cons of street vacation. At no time has Middleton framed the issue in terms of the exercise of police power in order to promote public safety or convenience. *See Neenah v. Krueger,* 206 Wis. 473, 476, 240 N.W. 402 (1932). This court has only been asked to interpret the plain and unambiguous terms of a street discontinuance statute.

The judiciary's job is to interpret statutes adopted by the legislature, not to determine municipal traffic policy questions. Section 66.296(2)(c), Stats., does not contemplate a case-by-case balancing of interests before determining whether a landowner is an abutter. For close to 120 years, our legislature has protected the rights of abutting landowners. While the veto power of landowners located on the remainder of a street has been reduced by various statutory amendments throughout the years, the legislature has never disturbed the absolute veto power of landowners abutting the portion of a street to be discontinued. By this opinion, the majority has usurped the power of the legislature and significantly diminished the rights of abutting property owners.

I respectfully dissent and would affirm the decision of the court of appeals.

I am authorized to state that Justices Shirley S. Abrahamson and William A. Bablitch join in this dissent.