L.L.N., Plaintiff-Appellant-Cross Respondent,

v.

J. Gibbs CLAUDER, Defendant,

ROMAN CATHOLIC DIOCESE OF MADISON, INC., Defendant-Respondent-Cross Appellant-Petitioner,

ABC INSURANCE COMPANY, Defendant,

RESEARCH PRODUCTS CORPORATION, a Wisconsin Corporation, Subrogated Party.

Supreme Court

*No. 95–2084. Oral argument March 4, 1997.—Decided May 23, 1997.*

(Also reported in 563 N.W.2d 434.)

For the defendant-respondent-cross appellant-petitioner there were briefs by *Donald L. Heaney, Kenneth B. Axe, Peter A. Martin* and *Lathrop & Clark*, Madison and oral argument by *Donald L. Heaney*.

For the plaintiff-appellant-cross respondent there was a brief by *David E. McFarlane, Melanie Cohen* and *LaFollette & Sinykin*, Madison and oral argument by *David McFarlane*.

¶ 1. N. PATRICK CROOKS, J. L.L.N. alleges that J. Gibbs Clauder, a priest assigned as a hospital chaplain by the Roman Catholic Diocese of Madison, Inc. (Diocese), abused his position as chaplain to engage her in a sexual relationship. Based on this, L.L.N. filed suit against the Diocese, claiming that: (1) the Diocese negligently supervised Clauder; and, (2) the Diocese is vicariously liable for Clauder's actions.[1] The Circuit Court for Dane County, George A. W. Northrup, Judge, entered an order granting summary judgment[2] to the Diocese on all counts. In a published

---

[1] L.L.N. also filed suit against Clauder personally for sexual exploitation by a therapist under Wis. Stat. § 895.70 (1987–88). This claim continues in the circuit court, and is not before this court on review.

All further references are to the 1987–88 Statutes unless otherwise indicated.

[2] The circuit court's order stated that it was granting the Diocese's motion to dismiss. However, since the circuit court accepted and considered affidavits and deposition transcripts submitted by both parties, we treat the motion as one for sum-

decision,[3] the court of appeals affirmed the circuit court's grant of summary judgment to the Diocese on the vicarious liability claims. However, the court of appeals reversed the circuit court's grant of summary judgment on the negligent supervision claim. The Diocese seeks review of this reversal.

¶ 2. Accordingly, the only issue before this court is whether the Diocese is entitled to summary judgment on L.L.N.'s claim that it negligently supervised Clauder. We conclude that it is. First, we hold that the First Amendment to the United States Constitution prohibits L.L.N.'s negligent supervision claim. Second, even if we assume that the First Amendment does not preclude L.L.N.'s claim, we conclude that the undisputed facts and all reasonable inferences drawn therefrom do not establish a genuine issue of material fact as to whether the Diocese knew or should have known about Clauder's alleged propensity to use his position as chaplain to sexually exploit patients whom he counseled. Thus, the Diocese is entitled to summary judgment as a matter of law on this basis as well. We therefore reverse the decision of the court of appeals.

## I.

¶ 3. In 1984, the Diocese assigned Clauder to serve as the chaplain at Meriter Hospital[4] in Madison, Wisconsin. While working at Meriter, Clauder resided at St. Bernard Catholic Church in Madison. Father

---

mary judgment. *See* Wis. Stat. § 802.06(2)(b); *L.L.N. v. Clauder*, 203 Wis. 2d 570, 575 n.2, 552 N.W.2d 879 (Ct. App. 1996).

[3] *L.L.N. v. Clauder*, 203 Wis. 2d 570, 552 N.W.2d 879 (Ct. App. 1996).

[4] At the time Clauder was assigned as a chaplain, Meriter Hospital was known as Madison General Hospital.

John Hebl was the parish pastor at St. Bernard.[5] While Clauder lived at the parish, Hebl had no supervisory authority over him. In addition, Clauder had no parish responsibilities at St. Bernard, although he did occasionally assist when asked.

¶ 4. In November 1988, L.L.N. was hospitalized at Meriter Hospital for complications with her pregnancy. Hebl asked Clauder to visit L.L.N., who was a member and employee of St. Bernard. Clauder met with L.L.N. at least once in the hospital, during which time they discussed her pregnancy, politics, and their interest in the pro-life movement.

¶ 5. In December 1988, L.L.N. was again hospitalized at Meriter Hospital. After having a miscarriage, L.L.N. asked Clauder to visit her, which he did on one or two occasions. They discussed her grief over losing the baby. After L.L.N. was discharged, Clauder telephoned her at home to check on her recovery. L.L.N. subsequently sent Clauder a thank-you note and invited him to lunch, an invitation which he accepted.

¶ 6. In the following months, L.L.N. and Clauder continued to meet outside the hospital. They dined together, visited art museums, attended pro-life rallies, exchanged gifts, and discussed politics, personal problems, and life in general. L.L.N. alleges that she viewed Clauder as her pastoral counselor and therapist during these meetings, because he gave her advice to help her cope with stress and depression.

¶ 7. On June 29, 1990, Clauder invited L.L.N. to his family's cabin near Rhinelander, Wisconsin. During this visit, they engaged in sexual intercourse at a hotel in Rhinelander. They continued their sexual relationship until May 1991.

---

[5] Hebl was employed by St. Bernard, which is a separate religious corporation from the Diocese.

¶ 8. Both Clauder and L.L.N. attempted to keep their relationship secret, often using aliases. However, on June 16, 1991, after she had ended the relationship, L.L.N. notified Bishop Cletus O'Donnell by letter of her sexual involvement with Clauder. It is undisputed that the Diocese had no actual knowledge of Clauder's involvement with L.L.N. before this time.

¶ 9. Subsequently, Auxiliary Bishop George Wirz asked Hebl whether he had ever noticed anything suspicious in regard to Clauder. Hebl informed Wirz of an incident he had observed several years earlier between Clauder and another woman, T.E. Specifically, one evening around 9:00 p.m., Hebl heard Clauder yell for help from his private room in the rectory. When Hebl entered Clauder's room, he found Clauder restraining a woman on the floor by straddling her body and holding down her hands. Clauder was bleeding from a bite on his wrist. Hebl recognized the woman as T.E., whom he had met on a few occasions when Clauder had invited her to the rectory for meals. Hebl separated Clauder from T.E., and escorted T.E. out of the rectory.

¶ 10. Hebl did not report this incident to anyone until after L.L.N wrote the letter revealing her relationship with Clauder to the Bishop. In addition, Hebl never investigated the matter any further. In his deposition, Hebl explained his perception of the incident in this manner:

> Q. Among other things, did it raise the question in your mind about whether there were some sexual activities going on between Father Clauder and [T.E.]?
>
> A. Let me put this kind of spin on it . . . obviously she attacked him, it seemed that way, and he was defending himself. You can put any interpretation

you want on that. I saw no visual signs, none what-soever of any sexual attack or intimacy or behavior, none whatsoever. Now, a person out there could say, "Well, that must have happened or could have happened." I did not put that spin on it.

Q. Was that a concern or suspicion that you had or did you dismiss that as not a realistic possibility?

A. I never accused him ever of anything along this line, any of the priests. I just don't, wouldn't think that's their behavior. . . .

Q. Now, even though you didn't accuse [Clauder] of any sexual involvement with [T.E.], was that a thought that was in your mind as a possibility?

A. Oh, yeah, I think with the circumstances under which this happened, there could be that possibil-ity, . . . but . . . I would never, never accuse him of it . . . .

(R.30 at 116–17.)

¶ 11. If Hebl had investigated this incident fur-ther, he would have discovered that T.E. and Clauder did not have any sexual contact on that day. However, Hebl also would have discovered that Clauder and T.E. were involved in a sexual relationship. Specifically, Clauder had become friends with T.E.'s family approxi-mately fifteen years earlier, while Clauder was assigned as a priest at St. Dennis Catholic Church in Madison, at which T.E. and her family were members. Subsequently, T.E. and Clauder developed a more inti-mate relationship. They frequently dined together, went to social events, and Clauder even traveled to Japan to meet T.E. on one occasion. According to Clauder, T.E. wanted to marry him, but he refused.

¶ 12. L.L.N. alleges that, because of the T.E. inci-dent that Hebl witnessed, the Diocese knew or should

have known that Clauder posed a risk of abusing his position as a hospital chaplain to sexually exploit patients whom he counseled. Accordingly, L.L.N. filed a claim for negligent supervision against the Diocese on May 28, 1993. On May 31, 1994, the Diocese filed a motion for summary judgment, contending that the negligent supervision claim is precluded by the First Amendment because it would require the court to determine the standard of care owed a parishioner in the supervision of clergy. At a hearing held on January 3, 1995, the circuit court granted summary judgment to the Diocese on this basis. The court of appeals reversed, concluding that "[t]o resolve L.L.N.'s claim, a factfinder need not interpret or weigh church doctrine but merely determine, under neutral rules of law, whether, under the facts, a reasonable person would know or should have known that Clauder's placement as hospital chaplain was likely to result in harm." *L.L.N. v. Clauder*, 203 Wis. 2d 570, 585–86, 552 N.W.2d 879 (Ct. App. 1996).

## II.

¶ 13. Procedurally, this case is before the court pursuant to the circuit court's grant of summary judgment to the Diocese. We review a grant of summary judgment *de novo*, applying the standards set forth in Wis. Stat. § 802.08(2) in the same manner the circuit court applies them. *See, e.g., Kafka v. Pope*, 194 Wis. 2d 234, 240, 533 N.W.2d 491 (1995); *Voss v. City of Middleton*, 162 Wis. 2d 737, 748, 470 N.W.2d 625 (1991). Specifically, a court first examines the pleadings to determine whether a claim for relief is stated and whether a material issue of fact is presented. *See, e.g., Voss*, 162 Wis. 2d at 747; *Grams v. Boss*, 97 Wis. 2d 332,

338, 294 N.W.2d 473 (1980). When examining the sufficiency of a complaint, a court takes as true all facts pleaded by the plaintiff and all inferences that can reasonably be derived from those facts. *See Voss*, 162 Wis. 2d at 748.

¶ 14. If the pleadings state a claim and demonstrate the existence of factual issues, a court next considers the moving party's affidavits or other proof to determine whether the moving party has made a prima facie case for summary judgment under § 802.08(2).[6] *See, e.g., Voss*, 162 Wis. 2d at 747–48; *Grams*, 97 Wis. 2d at 338. If a moving party has made a prima facie case for summary judgment, the opposing party must show, by affidavit or other proof, the existence of disputed material facts or undisputed material facts from which reasonable alternative inferences may be drawn that are sufficient to entitle the opposing party to a trial. *See, e.g., Voss*, 162 Wis. 2d at 748; *Grams*, 97 Wis. 2d at 338. Such proof may be less than is sufficient to prove the opposing party's case, but must be substantial and raise genuine issues of material fact. *See Leszczynski v. Surges*, 30 Wis. 2d 534, 539, 141 N.W.2d 261 (1966).

¶ 15. Therefore, in order to be entitled to summary judgment, the moving party must prove that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a

---

[6] If the defendant is the moving party, the defendant must establish a defense that defeats the plaintiff's cause of action. *See Voss v. City of Middleton*, 162 Wis. 2d 737, 748, 470 N.W.2d 625 (1991).

matter of law."[7] Wis. Stat. § 802.08(2); *see also Grams,* 97 Wis. 2d at 338. The affidavits and other proof submitted by the parties are viewed in a light most favorable to the opposing party. *See Delmore v. American Family Mut. Ins. Co.,* 118 Wis. 2d 510, 512, 348 N.W.2d 151 (1984). Likewise, any doubts as to the existence of a genuine issue of material fact are resolved against the moving party. *See, e.g., Rollins Burdick Hunter of Wisconsin, Inc. v. Hamilton,* 101 Wis. 2d 460, 470, 304 N.W.2d 752 (1981) (quoting *Maynard v. Port Publications, Inc.,* 98 Wis. 2d 555, 562–63, 297 N.W.2d 500 (1980)); *Grams,* 97 Wis. 2d at 338–39. However, evidentiary facts set forth in the affidavits or other proof are taken as true by a court if not contradicted by opposing affidavits or other proof.[8] *See Leszczynski,* 30 Wis. 2d at 539.

¶ 16. The issue of whether the First Amendment to the United States Constitution prohibits L.L.N.'s claim for negligent supervision is a question of law. *See Association of State Prosecutors v. Milwaukee County,* 199 Wis. 2d 549, 557, 544 N.W.2d 888 (1996). We review questions of law *de novo,* giving no deference to the lower courts. *See, e.g., id.*

---

[7] As this court has stated: "The purpose of the summary judgment procedure is not to try issues of fact but to avoid trials where there is nothing to try." *Rollins Burdick Hunter of Wisconsin, Inc. v. Hamilton,* 101 Wis. 2d 460, 470, 304 N.W.2d 752 (1981).

[8] "Pleadings are ineffectual as proof because facts stated in an affidavit take precedence over inconsistent allegations in a pleading." *Leszczynski v. Surges,* 30 Wis. 2d 534, 539, 141 N.W.2d 261 (1966).

## III.

¶ 17. We first must examine the pleadings to determine whether a claim for relief is stated and whether a material issue of fact is presented. In her complaint, L.L.N. alleges that "the Diocese was negligent in that it. . .[f]ailed to properly supervise Clauder. . . ." (R.2 at 8.) This court has not determined whether a claim for negligent supervision exists. *See Pritzlaff v. Archdiocese of Milwaukee*, 194 Wis. 2d 302, 325, 533 N.W.2d 780 (1995), *cert. denied*, 116 S. Ct. 920 (1996); *Isely v. Capuchin Province*, 880 F. Supp. 1138, 1151–53 (E.D. Mich. 1995). However, for purposes of this case, we assume that such a claim exists, without deciding the issue. *See Pritzlaff*, 194 Wis. 2d at 325–26 (assuming, without deciding, that a claim for negligent supervision exists). Accordingly, we are satisfied that the pleadings state a claim. In addition, the Diocese denied L.L.N.'s allegations in its answer. (R.4 at 6.) Thus, we also conclude that the pleadings present the existence of factual issues.

¶ 18. We therefore must examine the affidavits and other proof submitted by the Diocese to determine whether it has made a prima facie case for summary judgment under Wis. Stat. § 802.08(2). The Diocese sets forth two grounds upon which it is entitled to summary judgment. First, the Diocese contends that L.L.N.'s claim for negligent supervision is prohibited by the First Amendment. Second, based on the undisputed facts and all reasonable inferences drawn therefrom, the Diocese argues that it neither knew nor should have known about Clauder's alleged propensity to use his position as chaplain to sexually exploit patients whom he counseled.

## A. Constitutional Questions—First Amendment

¶ 19. The First Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment,[9] provides: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof. . . ." The first clause is referred to as the Establishment Clause, and the second as the Free Exercise Clause.[10] *See* 4 Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law: Substance & Procedure* § 21.1, at 446 (2d ed. 1992). The entanglement doctrine, which prohibits excessive governmental entanglement with religion, springs from the Establishment Clause.[11] *See Holy*

[9] *See Holy Trinity Community School, Inc. v. Kahl*, 82 Wis. 2d 139, 150, 262 N.W.2d 210, *cert. denied*, 439 U.S. 823 (1978); 4 Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law: Substance & Procedure* § 21.1, at 446 & n.2 (2d ed. 1992).

[10] In making its constitutional arguments, the Diocese relies primarily on the Establishment Clause. *See* Petitioner's Brief, at 19, n.17.

[11] Specifically, in *Lemon v. Kurtzman*, 403 U.S. 602 (1971), the Supreme Court held that where a violation of the Establishment Clause is alleged, a court must apply a three-part test to determine whether the challenged law passes constitutional muster: (1) the law must have a secular legislative purpose; (2) its principal or primary effect must be one that neither advances nor inhibits religion; and (3) it must not foster an excessive governmental entanglement with religion. *Id.* at 612–13; *see also Holy Trinity Community School, Inc.*, 82 Wis. 2d at 150 (explaining three-part test).

However, in the 1990s, the Supreme Court has neither consistently applied this three-part test nor formally rejected it. Yet, the Supreme Court has continued to focus on the concept of religious neutrality in making decisions involving the Establishment Clause. *See* 4 Rotunda & Nowak, *supra* § 21.3, at 86

*Trinity Community School, Inc. v. Kahl*, 82 Wis. 2d 139, 150, 262 N.W.2d 210, *cert. denied*, 439 U.S. 823 (1978); 4 Rotunda & Nowak, *supra* § 21.3, at 457.

■

¶ 20. It is well-settled that excessive governmental entanglement with religion will occur if a court is required to interpret church law, policies, or practices; therefore, the First Amendment prohibits such an inquiry. *See Isely*, 880 F. Supp. at 1150 (collecting cases); *Moses v. Diocese of Colorado*, 863 P.2d 310, 320 (Colo. 1993), *cert. denied*, 511 U.S. 1137 (1994); *Pritzlaff*, 194 Wis. 2d at 327–29. However, it is equally well-settled that a court may hear an action if it will involve the consideration of neutral principles of law. *See Isely*, 880 F. Supp. at 1150; *Moses*, 863 P.2d at 320.

¶ 21. We therefore must consider whether the determination of L.L.N.'s claim for negligent supervision would allow a court to apply neutral principles of law. We considered a substantially similar issue in *Pritzlaff v. Archdiocese of Milwaukee*, 194 Wis. 2d 302, 533 N.W.2d 780 (1995), *cert. denied*, 116 S. Ct. 920 (1996). Judith M. Pritzlaff alleged that Father John Donovan used his relationship and his position as a priest to coerce her to have a sexual relationship with him. *Id.* at 308. Pritzlaff brought claims against the Archdiocese for negligently hiring, retaining, training, and supervising the priest. *Id.* at 309–10. Pritzlaff further claimed that the Archdiocese knew or should have known that the priest had "a sexual problem." *Id.* at

(Supp. 1996). In fact, the concept of neutrality is a central principle under both of the religious clauses of the First Amendment. *Id.* § 21.1, at 447 (2d ed. 1992). Therefore, our analysis focuses on whether the negligent supervision claim would involve the application of neutral principles of law, rather than the *Lemon* test.

310. Subsequently, the Archdiocese brought a motion to dismiss on First Amendment grounds. *Id.*

¶ 22. This court first determined that the First Amendment prohibits claims against a religious entity for negligent hiring or retention, because such claims would require a court to develop a "reasonable cleric" standard of care, which would involve the interpretation of church canons and internal church policies. *Id.* at 326–28. Second, this court concluded:

> Although state inquiry into the training and **supervision** of clergy is a closer issue than inquiry into hiring and retention practices because under some limited circumstances such questions might be able to be decided without determining questions of church law and policies, **it is nonetheless prohibited by the First Amendment under most if not all circumstances.**

*Id.* at 328 (emphasis added). The court further explained:

> [A]ny inquiry into the policies and practices of the church Defendants in hiring or supervising their clergy raises the same kinds of First Amendment problems of entanglement discussed above, which might involve the court in making sensitive judgments about the propriety of the church Defendants' supervision in light of their religious beliefs. . . . The traditional denominations each have their own intricate principles of governance, as to which the state has no right of visitation. Church governance is founded in scripture, modified by reformers over almost two millennia.
>
> . . .
>
> It would therefore also be inappropriate and unconstitutional for this Court to determine after the fact

> that the ecclesiastical authorities negligently supervised or retained the defendant Bishop. Any award of damages would have a chilling effect leading indirectly to state control over the future conduct of affairs of a religious denomination, a result violative of the text and history of the establishment clause.

*Id.* at 329 (quoting *Schmidt v. Bishop*, 779 F. Supp. 321, 332 (S.D.N.Y. 1991). Applying these principles, this court held that Pritzlaff's claim for negligent supervision was precluded by the First Amendment because it would require an inquiry into church laws, practices, and policies. *Id.* at 330.

¶ 23. In *Clergy Sexual Misconduct: Confronting the Difficult Constitutional & Institutional Liability Issues*, 7 St. Thomas L. Rev. 31 (1994), an article cited several times by the *Pritzlaff* court,[12] James T. O'Reilly and Joan M. Strasser further elaborate on the reasons why "the measurement of duty and reasonableness needed to find negligence will inevitably entangle the civil court in the nuances of religious discipline practices." *Id.* at 39. For example, O'Reilly and Strasser state that the Roman Catholic Church has internal disciplinary procedures that are influenced by a religious belief in reconciliation and mercy. *Id.* at 36. They explain:

> The reconciliation and counseling of the errant clergy person involves more than a civil employer's file reprimand or three day suspension without pay for misconduct. Mercy and forgiveness of sin may be concepts familiar to bankers but they have no place

[12] *See Pritzlaff v. Archdiocese of Milwaukee*, 194 Wis. 2d 302, 316 n.3, 326–27, 330 (1995), *cert. denied*, 116 S. Ct. 920 (1996).

in the discipline of bank tellers. For clergy, they are
interwoven in the institution's norms and practices.

*Id.* at 45–46. Therefore, due to this strong belief in
redemption, a bishop may determine that a wayward
priest can be sufficiently reprimanded through coun-
seling and prayer. If a court was asked to review such
conduct to determine whether the bishop should have
taken some other action, the court would directly
entangle itself in the religious doctrines of faith,
responsibility, and obedience. *Id.* at 31, 43–46; *see also
Pritzlaff*, 194 Wis. 2d at 329 (quoting *Schmidt*, 779 F.
Supp. at 332).

¶ 24. Likewise, O'Reilly and Strasser explain
that negligent supervision claims would require a court
to formulate a "reasonable cleric" standard, which
would vary depending on the cleric involved, i.e., rea-
sonable Presbyterian pastor standard, reasonable
Catholic archbishop standard, and so on. *See Schmidt*,
779 F. Supp. at 328; *Roppolo v. Moore*, 644 So. 2d 206,
208 (La. Ct. App. 1994), *writ denied*, 650 So. 2d 253
(1995);[13] O'Reilly & Strasser, *supra*, at 43–46. Such
individualized standards would be required because,
as previously mentioned, church doctrines and prac-
tices are intertwined with the supervision and
discipline of clergy. O'Reilly & Strasser, *supra*, at
43–46. However, as O'Reilly and Strasser state: "Our
pluralistic society dislikes having its neutral jurists
place themselves in the role of a 'reasonable chief
rabbi,' 'reasonable bishop,' etc., because of the degree of
involvement that must accompany such decisional
framework for the civil tort judge." *Id.* at 46. This fur-
ther explains why this court held that negligent

---

[13] *Schmidt* and *Roppolo* were cited with approval in *Prit-
zlaff. See Pritzlaff*, 194 Wis. 2d at 329.

supervision claims are "prohibited by the First Amendment under most if not all circumstances." *See Pritzlaff*, 194 Wis. 2d at 328.

¶ 25. Turning to the present case, L.L.N. argues that this case is distinguishable from *Pritzlaff* because Clauder was a hospital chaplain whom L.L.N. viewed as her pastoral counselor, whereas *Pritzlaff* involved a sexual relationship between a priest and a parishioner. On the other hand, the Diocese argues that this case is indistinguishable from *Pritzlaff*, because priests and hospital chaplains essentially perform the same functions.

¶ 26. A chaplain takes care of the spiritual needs of hospital patients and their families. (R.13 at 2; R.15 at 105; R.30 at 58, 145.) According to Clauder, a Roman Catholic chaplain accomplishes this task by saying daily mass, visiting patients, administering the sacraments, satisfying prayer requests, and counseling individuals or groups. (R.30 at 145.) Clauder testified in his deposition that the duties of a chaplain are different from a parish priest in that they are more focused on the spiritual and possibly emotional needs of hospital patients. (R.30 at 58–59.)

¶ 27. Therefore, a chaplain's duties appear similar to the duties of a parish priest, albeit more focused in a hospital setting.[14] In particular, although a chaplain may provide counseling to patients, this function is not unique to chaplains. Parish priests also counsel members of their congregations. *See Schmidt*, 779 F.

---

[14] Although nothing in the record explicitly sets forth the duties of a parish priest, Clauder testified in his deposition about the similarities of the duties of a parish priest and chaplain. (*See* R.30 at 58–59.) In addition, during the oral arguments, the attorney for the Diocese detailed the similarities.

Supp. at 327 (stating that clergy of most denominations provide counseling to members of their congregations); *Moses*, 863 P.2d at 328 (indicating that the priest counseled parishioners at the church). Accordingly, the fact that Donovan was a parish priest and Clauder was a chaplain does not constitute a reason to distinguish *Pritzlaff* from this case.

¶ 28. Furthermore, in *Pritzlaff*, Pritzlaff alleged that the priest involved used his position as a priest to develop a "friend like" relationship with her while she was a student, and then abused that relationship by coercing her to have sex when she was an adult.[15] *See* Pritzlaff's Complaint, *contained in* Petitioner's Appendix in *Pritzlaff*, at 34; *see also* Respondent's Brief in *Pritzlaff*, at 2. Similarly, in this case, L.L.N. stated in her letter to Bishop O'Donnell: "[Clauder] met me in the hospital at a very low point in my life and befriended me. He became a significant part of my personal life and used me to meet his own needs."[16] (R.15 at 141.) Allegedly, both Clauder and Donovan used their position as priests to induce their victims to trust and rely on them, and then abused that trust and reliance to coerce their victims into having sex; therefore,

[15] It is unclear whether Pritzlaff viewed the priest as her pastoral counselor, because the record before the court in *Pritzlaff* appears to have been very limited. *See Pritzlaff*, 194 Wis. 2d at 306–11; Petitioner's Brief in *Pritzlaff*, at 2–7; Respondent's Brief in *Pritzlaff*, at 2–3. This is likely because *Pritzlaff* was before the court on a motion to dismiss, and therefore the court only considered the pleadings to determine whether Pritzlaff had stated a claim for relief. *See Pritzlaff*, 194 Wis. 2d at 311–12.

[16] However, it should be noted that L.L.N. testified at her deposition: "I'm no longer comfortable calling it friendship after what I've learned." (R.15 at 29.)

it appears that Clauder's alleged relationship with L.L.N. was similar to Donovan's alleged relationship with Pritzlaff. Thus, we do not agree with L.L.N. that this case is factually distinguishable from *Pritzlaff* on this ground.

¶ 29. We do recognize, however, that this case differs from *Pritzlaff* in that it involves a very specific allegation of notice to the Diocese.[17] In particular, L.L.N. argues that Hebl was obligated to inquire into Clauder's relationship with T.E. after witnessing the incident in the rectory. L.L.N. claims that if Hebl had investigated further, he would have discovered Clauder's sexual involvement with T.E. Therefore, L.L.N. contends that, through Hebl, the Diocese had constructive knowledge of the T.E. incident and Clauder's sexual relationship with T.E. Based on such constructive knowledge, L.L.N. claims that the Diocese should have known of Clauder's propensity to abuse his position as chaplain to become sexually intimate with patients.

¶ 30. However, these specific allegations of notice only further establish that a court would be required to interpret ecclesiastical law in order to decide L.L.N.'s negligent supervision claim. First, under agency law, a principal only has imputed knowledge of information which an agent gains while acting within his or her authority to bind the principal, or of information which an agent has a duty to give the principal. *See Ivers v. Pond Piano Co. v. Peckham*, 29 Wis. 2d 364, 369, 139 N.W.2d 57 (1966); *Restatement (Sec-*

---

[17] Because of the limited record in *Pritzlaff*, the court only considered the bare allegation in Pritzlaff's complaint that: "The ARCHDIOCESE knew or should have known that DONO-VAN had a sexual problem prior to 1959. . . ." *Pritzlaff*, 194 Wis. 2d at 310.

*ond) of Agency* § 272 (1957). In this case, in order to determine that Hebl was acting within his authority to bind the Diocese when he witnessed the T.E. incident, or had a duty to give the Diocese information about Clauder, a court would be required to consider church law, policies, or practices. This is because the undisputed record indicates that the Diocese did not assign Hebl to a position of authority over Clauder, such as an employer or supervisor. Hebl stated in an affidavit: "I had no authority over Gibbs Clauder in my capacity as pastor of St. Bernard Church or otherwise." (R.33 at 2.) Therefore, Hebl had no responsibility to report Clauder's behavior to the Diocese, other than any responsibility he may have had under church law, policies, or practices. Thus, a court would not be able to apply solely neutral principles of law to determine whether the Diocese had constructive knowledge of the T.E. incident, contrary to the First Amendment.[18]

¶ 31. Second, even if we assume that the Diocese had constructive knowledge of Clauder's relationship with T.E., we further conclude that a court would be required to consider and interpret the vow of celibacy in order to determine whether the Diocese negligently supervised Clauder. The deposition transcripts submitted by the Diocese demonstrate that T.E. was not a

---

[18] This decision should not be interpreted to mean that a court can never determine whether a cleric is an agent or employee of a religious organization, whether a cleric is acting within his or her authority to bind a religious organization, or whether a cleric has a duty to give a religious organization information. Such an inquiry may be possible without violating the First Amendment. However, such an inquiry is prohibited here, where Hebl's authority to bind the Diocese or duty to give the Diocese information can be determined only by reference to church law, policies, or practices.

patient whom Clauder counseled, but instead was a family friend and adult parishioner at the church where Clauder was a priest. The deposition transcripts also establish that Clauder's relationship with T.E. was an extensive one that involved numerous meals, social activities, and even a trip to Japan. Since these deposition transcripts are unopposed, we must accept them as true. *See Leszczynski*, 30 Wis. 2d at 539.

¶ 32. These undisputed facts demonstrate that Clauder, a single man, engaged in a consensual sexual relationship with an adult, single, female non-patient. L.L.N. argues that because of the Diocese's constructive knowledge of this, the Diocese should have taken some other action in supervising Clauder, such as removing him as chaplain. However, in order to hold the Diocese liable for breach of a duty of care to L.L.N., a court would be required to determine that constructive knowledge of Clauder's involvement with T.E. should have triggered a different response by the Diocese, because such involvement exposed a bad attribute of Clauder's character. *See Moses*, 863 P.2d at 327–29; *Restatement (Second) of Agency* § 213 (1957). Yet, in order to make this determination, a court would be required to consider the vow of celibacy, since sexual acts committed by single consenting adults are not legally wrong,[19] but instead become wrong only under church doctrine. *See Roppolo*, 644 So. 2d at 208. Accordingly, L.L.N. is essentially arguing that the Diocese owes a heavier duty to her than a non-secular employer would because of a religious doctrine. However, as one court has stated:

---

[19] Sexual acts committed by single consenting adults would only be legally wrong if committed in the presence of others. *See* Wis. Stat. § 944.20(1)(a).

> The vow of celibacy by clergy is a religious decision based upon religious belief; it does not create a civil duty. Under the free exercise clause of the First Amendment, the state may not compel affirmation of a religious belief nor impose requirements based on belief in any religion. [Citation omitted.] Thus the church had no greater civil duty based upon its religious tenets.

*Roman Catholic Bishop of San Diego v. Superior Court*, 50 Cal. Rptr. 2d 399, 406 (Cal. Ct. App. 1996). Similarly, another court has indicated:

> What may be viewed as sexual misconduct by one religion may be permitted or even encouraged by another. To do as plaintiff requests would require this Court to apply different standards to different litigants depending on their religious affiliations. This is a secular court. If sexual or other conduct of a priest violates secular standards, e.g., child molestation, this Court will impose whatever civil or criminal secular sanctions may be appropriate. But this Court has no authority to determine or enforce standards of religious conduct and duty.

*Roppolo*, 644 So. 2d at 208.

¶ 33. Moreover, to determine whether Clauder violated his vow of celibacy, a court would be required to consider the parameters of the vow. For this court to examine the vow of celibacy, and the church's action or inaction when faced with an alleged violation, would excessively entangle the court in religious affairs, contrary to the First Amendment.[20] *See Pritzlaff*, 194 Wis. 2d at 328–30.

---

[20] The dissent questions why a court would be required to interpret and consider the vow of celibacy, since "Clauder's breach of his celibacy vow alone proves nothing of legal significance." Dissenting op. at 712. However, in this case, L.L.N.

██

¶ 34. Thus, the Diocese has made a prima facie case for summary judgment by establishing that, in order to decide L.L.N.'s claim, a court would be required to examine the vow of celibacy. In addition, the Diocese has established that, in order to determine that Hebl was acting within his authority to bind the Diocese when he witnessed the T.E. incident, or had a duty to give the Diocese information about Clauder, a court would be required to consider church law, policies, or practices. L.L.N. has not shown, by affidavit or

claims that the Diocese had constructive notice of Clauder's risk of sexually exploiting women precisely because Clauder allegedly breached his vow of celibacy with T.E. This is clear from the following exchanges made during oral arguments among the justices and David McFarlane, attorney for L.L.N.:

> Justice Bablitch: . . . . Even if I were to accept, counsel, your statement that there is an obligation to make some inquiry, and assuming that the inquiry revealed what the record today reveals about [Clauder and T.E.'s] relationship, . . . why would that have any relevance, any relevance whatsoever, to the issue here, which is that the Diocese was somehow put on notice that this man was a sexual predator of patients?

> McFarlane: Because it showed that he had no regard for his vow of celibacy.

> . . . .

> Justice Geske: . . . . But the question that you did not want to answer is whether or not it is fundamentally wrong for somebody, a single person, to have sexual relations with another single person, [or whether or not it] only becomes wrong in the context of the church doctrine in which this priest engaged in a vow of celibacy.

> McFarlane: I'm not saying that that's wrong, your Honor. I'm saying that that should have triggered some response.

> Justice Geske: That the church doctrine should have triggered the inquiry. It's the church doctrine that does it.

> McFarlane: It's the whole context of facts, including the vow of celibacy.

other proof, the existence of disputed material facts or undisputed material facts from which reasonable alternative inferences may be drawn that are sufficient to entitle her to a trial. Accordingly, the Diocese has demonstrated that it is entitled to summary judgment as a matter of law because a court would not be able to apply neutral principles of law; therefore, the First Amendment precludes L.L.N.'s claim for negligent supervision.

### B. Sufficiency of Notice—Assuming No Constitutional Violation

¶ 35. Even if we assume that the First Amendment does not prohibit L.L.N.'s claim, we conclude that the undisputed facts and all reasonable inferences drawn therefrom do not establish a genuine issue of material fact in regard to the element of notice. Therefore, the Diocese is also entitled to summary judgment as a matter of law on this basis.

¶ 36. Since this court has not explicitly recognized the existence of a claim for negligent supervision in Wisconsin, we must look to other jurisdictions to determine the elements of the claim. In *Moses*, 863 P.2d at 329, the Supreme Court of Colorado quoted the *Restatement of Agency* in order to delineate such elements.[21] The *Restatement of Agency* provides in

---

[21] Although the *Moses* court relied on the *Restatement of Agency*, note that a claim for negligent supervision "is not based upon any rule of the law of principal and agent or of master and servant." *Restatement (Second) of Agency* § 213 cmt. a (1957). Instead, such a claim "is a special application of the general rules stated in the Restatement of Torts." *Id.* Therefore, a claim for negligent supervision is distinct from a claim for vicarious liability, in that the former is based on tort principles and the latter is based on agency principles. More specifically, with a

pertinent part: "A person conducting an activity through servants or other agents is subject to liability for harm resulting from his conduct if he is negligent or reckless . . . in the supervision of the activity. . . ." *Restatement (Second) of Agency* § 213 (1957), *quoted in Moses*, 863 P.2d at 329. Comment d to § 213 states:

> Liability results under the rule stated in this Section, not because of the relation of the parties, but because the employer antecedently had reason to believe that an undue risk of harm would exist because of the employment. The employer is subject to liability only for such harm as is within the risk. If, therefore, the risk exists because of the quality of the employee, there is liability only to the extent that the harm is caused by the quality of the employee which the employer had reason to suppose would be likely to cause harm.

*Id.* at § 213 cmt. d. Therefore, an employer is liable for negligent supervision only if it knew or should have known that its employee would subject a third party to an unreasonable risk of harm. *See id.; Moses*, 863 P.2d at 329.

---

vicarious liability claim, an employer is alleged to be vicariously liable for a **negligent act or omission committed by its employee** in the scope of employment. *See Shannon v. City of Milwaukee*, 94 Wis. 2d 364, 370, 289 N.W.2d 564 (1980); *Restatement (Second) of Agency* § 219(1). Thus, vicarious liability is based solely on the agency relationship of a master and servant. In contrast, with a negligent supervision claim, an employer is alleged to be liable for **a negligent act or omission it has committed** in supervising its employee. Therefore, liability does not result solely because of the relationship of the employer and employee, but instead because of the independent negligence of the employer. *See Restatement (Second) of Agency* § 213 cmt. d.

¶ 37. In the present case, it is undisputed that the Diocese had no actual knowledge of Clauder's alleged tendency to abuse his position as chaplain until after the sexual relationship between L.L.N. and Clauder ended. However, the parties disagree as to whether the Diocese should have known about Clauder's alleged propensity to abuse his position. As previously explained, L.L.N. argues that the Diocese had constructive knowledge of the T.E. incident and Clauder's relationship with T.E. through Hebl. Based on such constructive knowledge, L.L.N. claims that the Diocese should have known about Clauder's propensity to use his position as chaplain to sexually exploit patients.

¶ 38. We conclude that the undisputed facts and all reasonable inferences drawn therefrom do not demonstrate a genuine issue of material fact as to whether the Diocese should have known about Clauder's alleged propensity to use his position as chaplain to sexually exploit patients. Even if the Diocese had constructive knowledge of Clauder's relationship with T.E., this would have put the Diocese on notice, at most, that Clauder may again have consensual sexual relations with a single, adult, non-patient. However, it is illogical to conclude that such constructive knowledge was sufficient to put the Diocese on notice that Clauder was likely to abuse his position as chaplain to engage vulnerable patients in sexual intercourse.

¶ 39. To illustrate this point, consider the same set of facts in a non-secular setting. Suppose that an employer of a single counselor witnessed the counselor in a situation similar to the T.E. incident. Suppose the employer investigated into the matter, and discovered

that the counselor was involved in a sexual relationship with this woman, who was not a patient and was a single adult. Surely, this alone would not put the employer on notice that the counselor was likely to sexually exploit his patients. At most, it would provide notice to the employer that the counselor was not celibate. The same is true in this case.

¶ 40. At least one court has agreed with this rationale in an analogous setting. In *Roman Catholic Bishop of San Diego v. Superior Court*, 50 Cal. Rptr. 2d 399 (Cal. Ct. App. 1996), the plaintiff, a fifteen-year-old female, alleged that the church was negligent in hiring a priest because, if it had asked the priest if he had problems with his vows of celibacy, the church would have discovered that the priest had been involved in three sexual relationships with adult parishioners. *Id.* at 405. The court concluded: "Even if the church had learned of [the priest's] prior sexual affairs with adults, it is illogical to conclude the church should have anticipated that [the priest] would commit sexual crimes on a minor." *Id.* Similarly, even if the Diocese had constructive knowledge of Clauder's sexual relationship with T.E., this would not have put the Diocese on notice of Clauder's alleged propensity to abuse his position as chaplain to engage patients in sexual intercourse.

¶ 41. Thus, the Diocese has made a prima facie case for summary judgment in regard to the element of notice—whether the Diocese knew or should have known that Clauder would subject L.L.N. to an unreasonable risk of harm. L.L.N. has not shown, by affidavit or other proof, the existence of disputed material fact or undisputed material facts from which reasonable alternative inferences may be drawn that are sufficient to

701

entitle her to trial.[22] Accordingly, since the undisputed facts and all reasonable inferences drawn therefore do not demonstrate a genuine issue of material fact regarding notice, the Diocese is entitled to summary judgment as a matter of law.

¶ 42. In response to the dissenting opinion's conclusion that the T.E. incident in the rectory raises a reasonable inference that Clauder was engaged in "sexually assaultive behavior" toward T.E., we acknowledge that the selectively chosen facts as characterized by the dissent could raise such an inference if viewed in isolation. However, the dissent fails to consider the facts before us in the context of the entire record, which we are required to do on summary judgment. *See Oosterwyk v. Bucholtz*, 250 Wis. 521, 523, 27 N.W.2d 361 (1947) (court must consider whether a jury question is raised based "on the whole record made on the motion for a summary judgment").

¶ 43. The T.E. incident, viewed in the context of the whole record, does not raise a reasonable inference that Clauder was engaged in "sexually assaultive behavior." Rather, when viewed without hyperbole, an entirely different picture is presented. In particular, it

---

[22] Counsel for L.L.N. asserted at oral arguments that there is a genuine issue of material fact in regard to whether T.E. was a patient whom Clauder counseled. However, L.L.N. has not submitted evidentiary facts in the affidavits or other proof to support this assertion. To the contrary, the affidavits submitted by the Diocese indicate that T.E. was a family friend that Clauder met while he was a priest assigned to St. Dennis. Since this fact is not contradicted by opposing affidavits or other proof, we must take it as true for purposes of summary judgment. *See Leszczynski*, 30 Wis. 2d at 539. We therefore conclude that there is no genuine issue of material fact regarding whether T.E. was a patient.

is undisputed that T.E. and Clauder were engaged in a relatively long and consensual relationship. It is undisputed that Clauder and T.E. attended social events together, traveled abroad together, and often dined together in the rectory with other residents, including Hebl.

¶ 44. Likewise, it is undisputed that on the night of the incident, it was Clauder, not T.E., who called for Hebl's help. It is undisputed that when Hebl entered the room and told Clauder to stop restraining T.E., Clauder responded, "No, I can't, she's going to hurt me." (R.30 at 113.) It is undisputed that once Hebl separated Clauder and Hebl, they were both very calm. It is obvious that Hebl thought T.E. had attacked Clauder. Hebl stated in his deposition: "I mean, obviously she attacked him, it seemed that way, and he was defending himself. You can put any interpretation you want on that. **I saw no visual signs, none whatsoever of any sexual attack or intimacy or behavior, none whatsoever**." (R.30 at 116.) (Emphasis added.) Finally, it is undisputed that on that night, Clauder and T.E. had not engaged in sexual conduct.

¶ 45. Thus, in light of the entire record, there simply are no disputed material facts or undisputed material facts from which a reasonable inference may be drawn that Clauder was engaged in "sexually assaultive behavior" toward T.E. on the night Hebl witnessed the incident. Although the dissent suggests that such an inference exists because Hebl answered affirmatively when asked in a deposition whether it was within the "hypothetical realm of possibilities," the deposition questions and answers in no way give rise to a reasonable inference that Clauder in fact engaged in "sexually assaultive behavior" toward T.E. In fact, no one, not even L.L.N., has ever argued that the facts

give rise to such an inference.[23] The dissent stands alone in making this assertion.

¶ 46. In summary, we conclude that the First Amendment precludes L.L.N.'s claim for negligent supervision because the claim would not involve consideration of neutral principles of law. Instead, the claim would require a court to interpret church law and policies, which would result in excessive governmental entanglement with religion. In particular, in order to determine that Hebl was acting within his authority to bind the Diocese when he witnessed the T.E. incident, or had a duty to give the Diocese information about Clauder, a court would be required to consider church law, policies, or practices. In addition, in order to determine whether the Diocese breached a duty owed to L.L.N., a court would be required to interpret a priest's vow of celibacy. Furthermore, even if we assume that the First Amendment does not bar L.L.N.'s claim, we conclude that the undisputed facts and all reasonable inferences drawn therefrom do not establish a genuine issue of material fact in regard to whether the Diocese knew or should have known about Clauder's alleged propensity to use his position as chaplain to sexually exploit patients whom he counseled. Thus, the Diocese is entitled to summary judgment as a matter of law on this basis as well.

*By the Court.*—The decision of the court of appeals is reversed.

---

[23] Although the dissent claims that L.L.N. impliedly argued that Clauder engaged in "sexually assaultive behavior" toward T.E., *see* dissenting op. at 714-15, this is not the case. To the contrary, during oral arguments, Justice Geske asked L.L.N.'s attorney, "Is there any evidence of sexual assault in this case?" The attorney replied, "Not in this case, but there was certainly some physical contact with T.E."

¶ 47. WILLIAM A. BABLITCH, J. (*concurring*). I join that part of the majority opinion that holds that the Diocese is entitled to summary judgment as a matter of law as to the element of notice. However, I would not reach the First Amendment issue. The court does not generally decide constitutional questions if the case can be resolved on other grounds. *Labor and Farm Party v. Election Board*, 117 Wis. 2d 351, 354, 344 N.W.2d 177 (1984). I state no opinion as to that issue.

¶ 48. ANN WALSH BRADLEY, J. (*dissenting*). I dissent. After reviewing the record in this case, I conclude that there is a genuine issue of material fact as to whether the Diocese should have known that Clauder's placement as a hospital chaplain was likely to result in harm to a third party. I also conclude that the majority has unnecessarily reached and erroneously resolved the First Amendment issue presented in this case.

¶ 49. For L.L.N.'s negligent supervision claim[1] to survive the Diocese's motion for summary judgment, the record must support the existence of a genuine issue of material fact on the following issues: 1) that Clauder was an employee of the Diocese at all relevant times; 2) that Clauder engaged in sexually harmful behavior toward T.E., and later used his position as a hospital chaplain to sexually exploit L.L.N.; 3) that Hebl knew or should have known that Clauder engaged in sexually harmful behavior toward T.E.; and 4) that Hebl's knowledge is imputable to the Diocese. The majority reverses the court of appeals and reinstates the circuit court's grant of summary judgment on the basis that the record is devoid of facts or inferences

---

[1] Like the majority, I assume without deciding that Wisconsin recognizes a claim for negligent supervision.

from facts tending to establish that the Diocese was on notice of Clauder's alleged tendency to sexually exploit women. I disagree.

¶ 50. If the record supported only the proposition that the Diocese was on notice that Clauder had broken his vow of celibacy, the Diocese would be entitled to summary judgment. While Clauder failed to abstain from sex, such a strictly ecclesiastical indiscretion is a stranger to the secular law. There are, however, other facts and inferences from facts in the record which raise a genuine issue of material fact on the notice element of L.L.N.'s claim.

¶ 51. One evening around 9:00 p.m., Hebl entered Clauder's living quarters after hearing Clauder cry for help. Upon entering, Hebl observed the following: Clauder was straddling T.E.; T.E.'s blouse was torn; and Clauder's hand was bleeding from a bite wound.

¶ 52. Critical to the majority's analysis of summary judgment is its narrow view of the facts and its characterization of the T.E. incident as a "consensual sexual relationship." The majority concludes that "[t]hese undisputed facts demonstrate that Clauder, a single man, engaged in a consensual sexual relationship with an adult. . . ." Majority op. at 695. I submit that encountering Clauder, who was bleeding at the wrist from a bite, and was straddling T.E. while she was lying on her back on the floor with a ripped blouse, can lead to a reasonable inference that this is something other than a "consensual sexual relationship." It can lead to a reasonable inference that Clauder was engaged in sexually assaultive behavior.

¶ 53. Hebl knew T.E. as a woman who had on prior occasions visited Clauder at the rectory. He knew that Clauder had traveled to Japan to spend time with

her. He even acknowledged that at the time of the encounter he thought that something sexual might have been going on between Clauder and T.E. Later, after L.L.N. notified the Diocese of her alleged injuries, he reported this encounter to the auxiliary bishop and described it as "suspicious."

¶ 54. However, at the time of the incident he asked no questions and made no reports. Why? As explained by Hebl: "This was such a disappointment to me, I just wanted to forget about it."

¶ 55. Two expert witnesses for the plaintiff opined that the incident should have triggered an awareness by Hebl and the Diocese that Clauder might have a tendency to engage in inappropriate behavior with women and such awareness should have led to an evaluation. Dr. Gonsiorek stated:

> In this situation, it was negligent of the Diocese of Madison to continue to place Reverend Clauder as a hospital chaplain without such evaluation. In that placement, the Diocese should have known that Reverend Clauder would have close personal contact as a counselor with adult women, some of whom would be vulnerable because of the severe emotional difficulties they were experiencing as part of their hospitalization.

¶ 56. On a motion for summary judgment, a court takes as true all facts pleaded by the plaintiff and all inferences reasonably derived from those facts. *Voss v. City of Middleton*, 162 Wis. 2d 737, 747, 470 N.W.2d 625 (1991). Here, the affidavits and other proof must be viewed in the light most favorable to the plaintiff. *Lisa's Style Shop, Inc. v. Hagen Ins. Agency*, 181 Wis. 2d 565, 569, 511 N.W.2d 849 (1994). Any doubt as to the existence of a genuine issue of material fact must

be resolved against the moving party, here the Diocese. *Energy Complexes, Inc. v. Eau Claire County*, 152 Wis. 2d 453, 462, 449 N.W.2d 35 (1989). The incident witnessed by Hebl may have been, as the majority asserts, "a consensual sexual relationship" between adults. However, considering Clauder's straddling of T.E. on the floor, the ripped blouse, and the bloody bite on Clauder's wrist, it is also reasonable to infer that this was sexually assaultive behavior. I conclude that the reasonable inference from these facts, together with the affidavits of the plaintiff's experts, support the existence of a genuine issue of material fact.

¶ 57. The majority confuses the use of the entire record with the use of hyperbole. It declines to acknowledge excerpts and inferences from the record which are inconsistent with its conclusion, and labels the use of such excerpts and inferences as hyperbolic or excessive. I submit that at this summary judgment stage it is not excessive, indeed it is required, that we review the entire record, including excerpts of depositions and affidavits which may give rise to alternative inferences.

¶ 58. Curiously, the majority refuses to acknowledge that part of Hebl's testimony which supports the reasonable alternative inference of sexually assaultive behavior.[2] For example, the majority emphasizes Hebl's statement that he "saw no visual signs, none

---

[2] In disputing the inference of sexually assaultive behavior, the majority notes that Clauder and T.E. had a "relatively long and consensual relationship," and that the two attended social events, traveled, and dined together. Majority op. at 703. I am not sure what relevance these facts have to a determination of whether a reasonable inference exists that Hebl knew or should have known of sexually assaultive conduct by Clauder on the evening in question. General evidence of good times together

whatsoever of any sexual attack or intimacy or behavior, none whatsoever." Majority op. at 703 (emphasis omitted). Yet, the majority attaches no significance to material on the very next page of Hebl's deposition:

Q: Now, even though you didn't accuse him of any sexual involvement with [T.E.], was that a thought that was in your mind as a possibility?

A: Oh, yeah, I think with the circumstances under which this happened, there could be that possibility, you know but, you know gee, I would never, never accuse him of it. . . .

Q: I understand, but the main and only point I'm trying to talk about now is whether you remember when this happened, having the thought in your mind of whether something sexual had been going on between those two.

A: What I thought in my mind, you know, I said so many things so fast that I won't deny that I could have said, you know, to him in the course of my conversation, you know, "She could turn this whole thing around and accuse you of rape," or something like that. . . .

¶ 59. Elsewhere in Hebl's deposition appears the following exchange, which the majority declines to acknowledge:

Q: And isn't, at least in the hypothetical realm of possibilities, another of the possibilities is that he may have attacked her?

A: That's why I didn't want to make any judgments as to who was at fault here. I was not pointing the finger at her or him.

does not negate a specific incident of sexually assaultive behavior.

Q: So are you accepting that it is equally possible that he attacked her as it is that she attacked him?

A: I would certainly not throw out that possibility. It's nothing that I myself would accuse him of.

Q: But it is a possibility?

A: Sure. I did not accuse her of anything. I did not accuse him of anything. I just simply wanted them separated and her out.

¶ 60. In yet another part of the record, Hebl makes the following statement:

No, I don't remember me saying to him, accusing him of anything, if that's what you're looking at by saying did the thought enter into my mind, maybe. That's the best I can give you. It could have, it could not have. *I suppose we're reasonable people, and we would say this could be one of the possibilities but, you know, amongst many. . . .* Let me just add to that, we could turn this around and say she attacked him, or she came on to him or something like that, and he was defending himself. Now, that's the other side of the coin. . . .

(Emphasis added.)

¶ 61. The majority is unable to muster from Hebl's statements the reasonable inference that Hebl knew or should have known that the incident he witnessed between Clauder and T.E. was sexually assaultive in nature. Yet, far from the realm of "hyperbole," Hebl's own deposition testimony shows that reasonable people could draw such an inference. I do not deny that Hebl made other statements elsewhere in his deposition that are apparently at odds with those I have excerpted. However, the majority assumes a jury's role by choosing to credit some of Hebl's statements while discarding others. I conclude that in

arriving at its determination that there exists no genuine issue of material fact, the majority declines to acknowledge adverse facts in the record, and thereby usurps the jury's function.

¶ 62. Instead of ending its inquiry with a finding of an absence of facts supporting L.L.N. on the notice element of her negligent supervision claim, the majority goes on to find that L.L.N.'s negligent supervision claim is barred under the First Amendment because it would require excessive court entanglement in matters of ecclesiastical law and internal church policies. Majority op. at 693-94. It is by now well established that, as a basic rule of judicial decision making, a court should not reach a constitutional issue unless it is essential to the disposition of the case.[3]

¶ 63. I am perplexed. What prompts the majority to unnecessarily reach out to tackle a constitutional issue? I agree with the concurrence that since this case is decided on summary judgment grounds, the majority should refrain from reaching the First Amendment issue. Violating a fundamental rule of judicial restraint, the majority reaches beyond the purported factual deficiencies of L.L.N.'s claim to unnecessarily, and incorrectly, decide a constitutional issue.

---

[3] *See, e.g., City of Franklin v. Crystal Ridge, Inc.*, 180 Wis. 2d 561, 573 n.8, 509 N.W.2d 730 (1994); *Ziegler Co. v. Rexnord, Inc.*, 139 Wis. 2d 593, 612, 407 N.W.2d 873 (1987); *S.B. v. Racine County*, 138 Wis. 2d 409, 412, 406 N.W.2d 408 (1987); *Labor and Farm Party v. Elections Bd.*, 117 Wis. 2d 351, 354, 344 N.W.2d 177 (1984); *Kollasch v. Adamany*, 104 Wis. 2d 552, 561, 313 N.W.2d 47 (1981); *State v. State Fair Park, Inc.*, 21 Wis. 2d 451, 453, 124 N.W.2d 612 (1963); *Witek v. State*, 2 Wis. 2d 404, 407, 86 N.W.2d 442 (1957); *Smith v. Journal Co.*, 271 Wis. 384, 390, 73 N.W.2d 429 (1955); *State ex rel. Rosenhein v. Frear*, 138 Wis. 173, 176, 119 N.W. 894 (1909).

¶ 64. L.L.N.'s claim is precluded by the First Amendment, according to the majority, because it cannot be resolved without two constitutionally impermissible judicial inquiries. First, in order to determine that the Diocese had constructive knowledge through Hebl of Clauder's sexual relationship with T.E., "a court would be required to consider church law, policies, or practices." Majority op. at 694. Second, "a court would be required to consider and interpret the vow of celibacy in order to determine whether the Diocese negligently supervised Clauder." *Id.* The majority errs on both grounds of its First Amendment ruling. That portion of the majority's holding dealing with the vow of celibacy is most easily disposed of, and I deal with it first.[4]

¶ 65. The majority concludes that knowledge of a clergyman's breach of a vow of celibacy cannot possibly give a religious organization notice that a clergyman is disposed to sexually harmful or deviant behavior. Majority op. at 701. I agree; Clauder's breach of his celibacy vow alone proves nothing of legal significance. It is therefore inconsistent for the majority to use the

---

[4] For purposes of considering the First Amendment issue, I take as a given, as I must in a motion for summary judgment, the existence of facts necessary to support L.L.N.'s negligent supervision claim. Thus, I assume the following: 1) Clauder was an employee of the Diocese at all relevant times; 2) Clauder engaged in sexually harmful behavior toward T.E., and later used his position as a hospital chaplain to sexually exploit L.L.N.; 3) Hebl knew or should have known that Clauder sexually harmed T.E.; and 4) Hebl was an employee of the Diocese, and his knowledge was thereby imputable to the Diocese. These facts must be assumed because in their absence, there is no negligent supervision claim, and therefore no First Amendment defense.

712

"necessity" of an inquiry into celibacy as a basis for barring the negligent supervision claim on First Amendment grounds. *Id.* at 694-96. Because the celibacy vow is irrelevant to a negligent clergy supervision claim, it simply cannot be that L.L.N.'s claim "require[s a court] to consider and interpret the vow of celibacy in order to determine whether the Diocese negligently supervised Clauder." *Id.* at 694.

¶ 66. It is axiomatic that a claim does not "require" consideration of a fact which fails to aid in proving the claim. Because proof of Clauder's disloyalty to his vow of celibacy adds nothing to L.L.N.'s negligent supervision claim, a court has no occasion to consider or interpret the vow. The First Amendment is therefore not implicated.

¶ 67. The majority is incorrect in asserting that L.L.N.'s negligent supervision claim against the Diocese is premised solely on Clauder's breach of his vow of celibacy with T.E. Majority op. at 696 n.20. To the contrary, the plaintiff's complaint makes only the general assertion that the Diocese breached its duty to "supervise and oversee all priests with respect to sexual improprieties." None of L.L.N.'s claims against the Diocese even mentions the word "celibacy."

¶ 68. The majority also erroneously states that this dissent is alone in asserting that the facts of this case give rise to an inference "that Clauder was engaged in 'sexually assaultive behavior' toward T.E." Majority op. at 703. Such an assertion is subsumed within L.L.N.'s allegation of "sexual impropriety."[5] The affidavits of the plaintiff's expert witnesses also refer to

---

[5] The majority incorrectly relies on the following exchange at oral argument for the proposition that there is no reasonable inference that Clauder engaged in sexually assaultive conduct toward T.E.:

the Diocese's constructive notice of Clauder's propensity to engage in inappropriate sexual behavior. Furthermore, Hebl conceded under questioning that sexually assaultive behavior by Clauder was one reasonable inference that could be drawn from the T.E. incident.

¶ 69. According to the majority, L.L.N.'s negligent supervision claim also creates an unconstitutional requirement that a court ascertain the relationship between Clauder and the Diocese, Hebl and the Diocese, and Clauder and Hebl. The nature of Clauder's connection with the Diocese is relevant because L.L.N.'s negligent supervision claim fails in the absence of a employer-employee relationship between Clauder and the Diocese. *See Midwest Knitting Mills, Inc. v. United States*, 950 F.2d 1295, 1298 (7th Cir. 1991) (describing negligent supervision liability of "masters" [employers] for acts of "servants" [employees]). The relationship between Hebl and the Diocese is also critical, because L.L.N. must be able to impute Hebl's asserted knowledge of Clauder's sexually exploi-

Justice Geske: "Is there any evidence of sexual assault in this case?"

Mr. McFarland (L.L.N.'s attorney): "Not in this case, but there was certainly some physical contact with T.E."

Majority op. at 704, n. 23. It is unclear from the phrase, "Not in this case," whether Attorney McFarland was stating that there is no evidence of sexually assaultive conduct toward L.L.N. alone, or that there is no evidence of sexually assaultive conduct toward either T.E. or L.L.N. Only the latter interpretation would provide support for the majority's ultimate conclusion. I submit that it is unlikely that Attorney McFarland abandoned in oral argument a legal theory subsumed in L.L.N.'s assertion of "sexual impropriety," pursued vigorously in the deposition of Hebl, and supported by the facts in the record. *See supra* at 709-10.

tive tendencies to the Diocese. This can only be done if an agency relationship exists between Hebl and the Diocese. *See Ivers & Pond Piano Co. v. Peckham*, 29 Wis. 2d 364, 369, 139 N.W.2d 57 (1966).

¶ 70. Contrary to the majority's conclusion, the Diocese may be charged with constructive notice through Hebl regardless of whether he supervised Clauder. Hebl's knowledge will be imputed to the Diocese so long as Hebl obtained the knowledge in the course of his employment and within the scope of his authority. *See Ivers & Pond Piano Co.*, 29 Wis. 2d at 369; 3 C.J.S. Agency § 432 (1973). The majority does not dispute that the Diocese placed Hebl and vested him with the authority to maintain order at St. Bernard's parish. Hebl's authority at St. Bernard's is demonstrated in his own deposition testimony, in which he stated that it was *his* policy that prevented nonfamily members from staying in priests' rooms, and it was *he* who informed each priest of the policy. There is no assertion that Hebl was acting outside of his authority when he investigated the cry for help and discovered T.E. in Clauder's room. Consideration of these facts in no way requires a court to stand in judgment of church policy or practice.

¶ 71. Religious organizations, like any non-human entity, can "act" only through their agents and employees. Accordingly, respondeat superior and negligent supervision claims, which are predicated on an employer-employee relationship, are perhaps the only means of imposing tort liability on a church or similar institution. If courts were not permitted to determine the legal relationship between religious organizations and their clerics, religious organizations would be effectively immunized from tort liability.

¶ 72. The First Amendment does not imbue religious organizations with blanket immunity from tort liability. *See Moses v. Diocese of Colorado*, 863 P.2d 310, 314 (Colo. 1993). A court is free to apply "neutral principles" of state law to religious organizations without implicating the First Amendment. *See Jones v. Wolf*, 443 U.S. 595, 606 (1979) ("[t]he neutral-principles approach cannot be said to 'inhibit' the free exercise of religion, any more than do other neutral provisions of state law governing the manner in which churches own property, hire employees, or purchase goods").[6] In determining whether an employer-employee relationship exists between a religious institution and its clerics, a court does not implicate First Amendment considerations so long as the question may be decided without "determining questions of church law and policies." *Pritzlaff v. Archdiocese of Milwaukee*, 194 Wis. 2d 302, 328, 533 N.W.2d 780 (1995).

¶ 73. While *Pritzlaff* announced that negligent supervision claims would be barred in the overwhelming majority of cases, the court did not create an across-the-board proscription on such claims. Critically, negligent supervision claims are precluded only when they

---

[6] *See also Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993) (stating that "a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice"); *Employment Div., Oregon Dep't of Human Resources v. Smith*, 494 U.S. 872, 878–79 (1990) (noting that the United States Supreme Court has "never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate. On the contrary, the record of more than a century of our free exercise jurisprudence contradicts that proposition").

would require an inquiry into church policies and doctrine. In that sense, *Pritzlaff* is consistent with those jurisdictions holding that negligent supervision claims are not necessarily precluded on First Amendment grounds. *See, e.g., Nutt v. Norwich Roman Catholic Diocese*, 921 F. Supp. 66 (D. Conn. 1995); *Kenneth R. v. Roman Catholic Diocese of Brooklyn*, 654 N.Y.S.2d 791 (N.Y. App. Div. 1997); *Moses*, 863 P.2d 310.

¶ 74. The First Amendment does not prevent a court from determining whether an agency or employer-employee relationship exists between a religious organization and its clerics. Such an inquiry does not focus on the commission of an act which is "rooted in religious belief." *Wisconsin v. Yoder*, 406 U.S. 205, 215–16 (1972). The question also does not embroil the judiciary in a church's internal dispute over matters of ecclesiastical policy and procedure. *See Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94 (1952); *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696 (1976).

¶ 75. I agree with the court of appeals that to ascertain the nature of the relationship between Clauder and the Diocese, and between Hebl and the Diocese, the circuit court need only apply the neutral rules of agency to the Diocese in the same manner as it would to a secular entity. The court would not be required to resolve disputed issues of religious doctrine or practice. I therefore conclude that such an inquiry is permissible under the First Amendment.

¶ 76. The majority's reasoning that the First Amendment bars consideration of the relationship between a religious organization and its clergy has implications far beyond cases dealing with sexual intercourse between clergy and adult parishioners. If courts cannot take notice of the relationship between a church and a cleric, then respondeat superior and neg-

ligent supervision claims can never be maintained against a religious organization, regardless of prior notice or the degree of sexual deviation.[7]

¶ 77. For example, suppose that a church knows with certainty that one of its priests is inclined to sexually molest children. The church places the priest in a situation where the priest has regular, unsupervised access to children. The priest molests a child. Under the majority's view, a negligent supervision claim is precluded because the claim requires a court to ascertain whether an employment relationship exists between the priest and the church.

¶ 78. Why should a diocesan decision to let a known pedophile work unsupervised with children enjoy ecclesiastical protection? Is the answer to be, as the majority opinion suggests, that "due to [a] strong belief in redemption, a bishop may determine that a wayward priest can be sufficiently reprimanded through counseling and prayer," and that "mercy and forgiveness . . . are interwoven in the institution's norms and practices"? Majority op. at 690. This reasoning, which stretches the fabric of the First Amendment

---

[7] The majority does not attempt to explain, because it cannot, why an inquiry into Clauder and Hebl's employment relationship with the Diocese is constitutionally barred in this case, but "may be" constitutionally permissible in other cases. Majority op. at 694 n. 18. An inquiry into the existence of a cleric's employment relationship precedes and is independent of an inquiry into the nature of the alleged tortious conduct; the analysis is the same in every case. There is therefore no basis for the majority's statement that its decision might allow a court in a future case to determine the nature of a cleric's employment relationship with a religious organization. In truth, the majority's reasoning operates in every instance as an absolute bar to an inquiry into the existence of a cleric's employment relationship.

to provide blanket protection to the Diocese in all cases, is erroneous.

¶ 79. If after this case the Diocese were to reinstate Clauder as a hospital chaplain, and Clauder were to use that position to obtain sexual gratification from patients, I cannot accept that the First Amendment would act to bar a negligent supervision claim against the Diocese. The "mercy and forgiveness" of a religious organization toward a known sexually exploitive clergyman does not excuse the organization from responding in damages when the cleric uses his position to procure his next victim. No secular entity enjoys such a broad immunity from tort liability. If a secular employer fails to supervise a servant with known dangerous inclinations, that employer faces liability when the servant uses his or her position with the employer to commit a tortious act. So should it be when a religious organization fails to supervise a cleric known to commit sexually harmful or exploitive acts.

¶ 80. In conclusion, there is a genuine issue of material fact as to whether the Diocese should have known that Clauder's placement as a hospital chaplain would likely subject a third party to an unreasonable risk of harm. The Diocese is therefore not entitled to summary judgment on L.L.N.'s negligent supervision claim. Furthermore, I disagree with the majority's conclusion that L.L.N.'s negligent supervision claim is barred by First Amendment considerations of excessive court entanglement in religious affairs. Accordingly, I respectfully dissent.

¶ 81. I am authorized to state that Chief Justice Shirley S. Abrahamson joins this opinion.